118 F.3d 1306
 97 Cal. Daily Op. Serv. 5270, 97 Daily Journal
D.A.R. 8559
Jay RAM, Plaintiff-Appellee,
v.
Winona RUBIN, in her capacity as Director of the Department
of Human Services, State of Hawai'i, Defendant,
and
William Silva, Defendant-Appellant.
Jay RAM, Plaintiff-Appellant,
v.
Winona RUBIN, in her capacity as Director of the Department
of Human Services; County of Hawaii, a municipal
corporation; William Silva; Elsie Kamahele, John Does
1-10; Jane Does 1-10; Doe Corporations 1-10; Doe
Partnership 1-10; Doe Joint Ventures 1-10; and Doe
Governmental Entities 1-10, Defendants-Appellees.
 Nos. 94-16508, 94-17185.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 10, 1996.
Decided July 2, 1997.
 
 Eric A. Seitz, Honolulu, HI, for Plaintiff-Appellee-Cross-Appellant Ram.
 Thomas D. Farrell, Deputy Attorney General, Honolulu, HI, for State Defendants-Appellees.
 Steven Christensen, Deputy Corporation Counsel, County of Hawaii, Hilo, HI, for Defendant County of Hawaii and Defendant-Appellant Silva.
 Appeals from the United States District Court for the District of Hawaii; Alan C. Kay, District Judge, Presiding. D.C. No. CV-93-00917-ACK.
 Before: HUG, Chief Judge, SCHROEDER and HAWKINS, Circuit Judges.
 HUG, Chief Judge:
 
 
 1
 In this civil rights action we must determine whether a social worker and a police officer who removed minor children from the custody of their father without prior notice or a hearing are immune from suit under the doctrine of qualified immunity. The district court entered summary judgment for the social worker and denied summary judgment for the police officer. We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's summary judgment for the social worker and affirm the denial of summary judgment for the police officer.
 
 I. Jurisdiction
 
 2
 Following allegations in January, 1992, by Z.D., a minor, that he was sexually abused by Jay Ram, Child Protective Services Crisis Unit ("CPS") began an investigation. No action was taken to remove Ram's five adopted sons and one foster son from his custody until October 22, 1993. On that date, Elsie Kamahele, acting in her capacity as the East Hawaii Social Services Section Administrator, and Lieutenant William Silva of the Hawaii County Police Department removed Ram's children from his custody without prior notice to Ram or a hearing as to the necessity for doing so. The children were released into Ram's custody on October 26, 1993, and Ram initiated this action in state court on November 23. Ram alleged, inter alia, that Kamahele and Silva, acting under the color of state law, deprived him of his constitutional rights in violation of 42 U.S.C. § 1983.
 
 
 3
 After removing the action to federal court, Kamahele and Silva moved for summary judgment on the basis of qualified immunity.[1] The district court denied Silva's motion for summary judgment, and he appeals. The district court granted Kamahele's motion, a decision that Ram now appeals. We must first determine whether and to what extent we have appellate jurisdiction over these appeals.
 
 
 4
 Silva's appeal is an interlocutory one. "We have jurisdiction to hear an interlocutory appeal from a denial of qualified immunity when the question involves a matter of law." Collins v. Jordan, 110 F.3d 1363, 1370 (9th Cir.1996). Whether Ram has alleged the violation of a clearly established right is a question of law. See Carnell v. Grimm, 74 F.3d 977, 978 (9th Cir.1996). To the extent that Silva's appeal requires the determination of a fact-related dispute, namely whether the evidence in the pretrial record is sufficient to show a genuine issue of fact for trial, we lack jurisdiction. Johnson v. Jones, 515 U.S. 304, 304-10, 115 S.Ct. 2151, 2153-54, 132 L.Ed.2d 238, 243 (1995). We therefore have jurisdiction only to determine whether the law governing Silva's conduct was clearly established.
 
 
 5
 Ram appeals the district court's entry of summary judgment for Kamahele. We have appellate jurisdiction of this appeal based upon the district court's entry of a final judgment under Federal Rule of Civil Procedure 54(b).
 
 II. Background
 
 6
 As noted above, Z.D. accused Ram of sexually abusing him during a weekend visit to Ram's foster home. Z.D.'s allegations were referred to CPS in January, 1992. On January 27, 1992, CPS and the Hawaii County Police Department initiated a joint investigation. Z.D., in the first of two interviews, made no allegations of sexual abuse. In the second interview, which was videotaped, Z.D. accused Ram of touching his penis, but gave inconsistent versions of the incident and, ultimately, stated that it happened "by accident."
 
 
 7
 The police investigator reported to Silva that Z.D. made no allegations of abuse in the first interview and, in the investigator's opinion, Z.D.'s father was prompting Z.D. The police investigation was suspended. CPS also closed its investigation, labelling the allegations unconfirmed.[2]
 
 
 8
 In September, 1992, a second investigation was initiated.[3] Gerald Higa, the only CPS investigator who had no prior contact with Ram, was assigned to the case. On October 21, he interviewed Ram who emphatically denied the allegations. The next day Higa interviewed Ram's children and each denied having witnessed the alleged incident, called Z.D. a liar, said that Z.D. misconstrued situations, and denied ever having been physically or sexually abused by Ram. Higa also contacted three of Ram's adult sons, each of whom were no longer living on Ram's farm. All three denied ever having witnessed sexual or physical abuse, and emphatically stated that Ram had never abused them. Finally, Higa contacted two people whom he believed could provide information about Ram. Both contacts proved unremarkable. One person, who lived on Ram's farm for a year, even stated that she had never witnessed homosexual activities or sexual abuse on the farm.
 
 
 9
 Higa concluded his investigation with a written report, which was sent to Silva and available to Kamahele. The report provided that the credibility of Z.D. and his father was "very questionable" and that the evidence "overwhelmingly impugns [Z.D.'s] and his father's character and credibility." Higa also wrote that "there is no conclusive evidence or any strong indication" of abuse, and he considered the allegations unconfirmed. Higa's immediate supervisor signed the report, which was approved by the Hawaii Branch Administrator.
 
 
 10
 On October 14, 1993, over one-year after Higa was assigned to investigate Z.D.'s allegations, Ram was indicted on two counts of sexual abuse based on the accusations of Z.D. In June, 1994, the charges were dismissed.
 
 
 11
 After learning of the indictment, Silva contacted the director of CPS, Peggy Hilton, and told her that he intended to take Ram's children into temporary protective custody in order to interview them and conduct a third investigation. Hilton refused to cooperate with Silva and questioned the need for taking the children into custody because no new allegations had been made and CPS twice before found the allegations unconfirmed.
 
 
 12
 Silva then contacted Kamahele, Hilton's supervisor. Silva explained that he intended to take the children into custody. He told Kamahele that he had received a report from the F.B.I. about Ram, but when she asked to see the report, he stated that a judge had signed a protective order and he could not disclose the report's contents. Silva, however, told Kamahele that she should contact California authorities and they might be able to provide some of the same information.
 
 
 13
 Kamahele did just that. Child Protective Service officials and a Tehama County police officer explained that, seven to ten years before, they had investigated allegations of physical abuse made against Ram. They faxed Kamahele copies of their reports, but it is unclear when she received those reports.
 
 
 14
 Kamahele and Silva took Ram's five adopted sons and one foster son into temporary protective custody without prior notice or a hearing on October 22, 1993. The children were interviewed and medical and psychological examinations were conducted to discover the possibility of sexual abuse. On October 26, Kamahele released the children into Ram's custody after the investigation indicated that the children were not in imminent danger of being sexually abused by Ram.
 
 III. Discussion
 
 15
 Qualified immunity shields government officials from liability for civil damages if, in light of clearly established law governing the challenged conduct, the official objectively could have believed the conduct was lawful. Carnell, 74 F.3d at 978. When an official asserts qualified immunity, we apply a two-part analysis: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" Id.
 
 
 16
 A. Was the law governing Silva and Kamahele's conduct clearly established?
 
 
 17
 Ram bears the burden of showing that his right, which was allegedly violated when Kamahele and Silva took his children into temporary custody, was clearly established. See Perkins v. City of West Covina, 113 F.3d 1004, 1008 (9th Cir.1997). In 1993, it was clear that a parent had a constitutionally protected right to the care and custody of his children and that he could not be summarily deprived of that custody without notice and a hearing, except when the children were in imminent danger. Caldwell v. LeFaver, 928 F.2d 331, 333 (9th Cir.1991). Despite this, Silva and Kamahele argue that the parameters of this right were not sufficiently particularized to put them on notice that, under the circumstances of this case, their conduct infringed on Ram's rights. Stated somewhat differently, their argument is that "Harlow [v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ] requires a constitutional right to be clearly established so that officials are on notice that their conduct is in violation of that right." They contend that in 1993 it was not clear what circumstances justified, or failed to justify, taking minor children into protective custody without a hearing.
 
 
 18
 This argument is unavailing. In order to be clearly established for qualified immunity purposes, the contours of the asserted right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Camarillo v. McCarthy, 998 F.2d 638, 640 (9th Cir.1993). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful...." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Rather, the unlawfulness of the conduct need only have been apparent in light of preexisting law. Id.
 
 
 19
 Preexisting law clearly required Kamahele and Silva to provide Ram with notice and a hearing before they interfered with his custodial rights. See Santosky v. Kramer, 455 U.S. 745, 770, 102 S.Ct. 1388, 1403-04, 71 L.Ed.2d 599 (1982) (to terminate parental rights state must conduct a hearing under a constitutionally proper standard). The exception to this norm applies only if Ram's children were in imminent danger of harm. It was thus apparent that taking Ram's children into custody without notice and a hearing was unlawful unless there was imminent danger to the children. Accordingly, Ram has met his burden of showing that the right allegedly violated was clearly established at the time of his conduct. We turn next to the second step in qualified immunity analysis.
 
 
 20
 B. Under clearly established law, could a reasonable officer have believed that seizing Ram's children was lawful?
 
 
 21
 As a threshold matter, we reiterate that we do not have jurisdiction to determine the factual issue whether a reasonable officer could have believed that, based on the information known to Silva, seizing Ram's children was lawful. The district court denied Silva summary judgment because the pretrial record indicated that genuine issues of material fact existed. This ends our inquiry with regard to Silva's appeal.
 
 
 22
 Ram's appeal of the district court's grant of summary judgment for Kamahele, however, stands in a different posture. Ram's appeal is certified under Rule 54(b) as a final judgment and falls outside the scope of Johnson v. Jones. We must determine, therefore, whether a genuine issue of material fact exists regarding whether a reasonable officer in Kamahele's position could have believed that taking the children into temporary custody was lawful.
 
 
 23
 As stated above, normally, notice and a hearing are required before the children can be removed, even temporarily, from the custody of their parents. A state official cannot remove children from their parents unless the official has a reasonable belief that the children are in imminent danger. An indictment or serious allegations of abuse which are investigated and corroborated usually gives rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody. See Baker v. Racansky, 887 F.2d 183 (9th Cir.1989) (reversing district court's denial of summary judgment where children were taken into protective custody two days after allegations of abuse and an investigation yielded evidence of abuse).
 
 
 24
 Here, however, Kamahele had much more information than an indictment. She acted on two-year old allegations that twice had been investigated and found unconfirmed. She took the children into custody against the advice of subordinates who were more familiar with the case than she was. Kamahele now questions the quality and thoroughness of the investigations and the objectiveness of her subordinates. Whether a social worker reasonably could have believed the Ram children were in imminent danger could well depend upon the testimony concerning the depth and integrity of the two investigations. We conclude, therefore, that genuine issues of material fact preclude summary judgment.
 
 IV. Conclusion
 
 25
 We conclude that Ram alleged the violation of a clearly established right, i.e., that a parent has a constitutionally protected right to the care and custody of his children and he cannot be summarily deprived of custody without notice and a hearing except when the children are in imminent danger. Kamahele and Silva were not frontline investigators who were forced to make split-second determinations. Both were supervisors who acted on two-year-old allegations against the recommendations of investigators who were more familiar with the allegations of abuse. Their decision to take the Ram children immediately into custody without notice or a hearing, raises genuine issues of material fact as to whether a reasonable state official could have believed that their actions were lawful.
 
 
 26
 The district court's denial of summary judgment for Silva in No. 94-16508 is AFFIRMED. In No. 94-17185, the district court's entry of summary judgment for Kamahele is REVERSED. Both cases are REMANDED to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 Actually, Kamahele moved for judgment on the pleadings. The district court treated the motion as one for summary judgment because it considered matters outside the pleadings
 
 
 [2]
 An unconfirmed disposition means that, based on the information obtained in the investigation, in the investigator's opinion, the allegations cannot be confirmed
 
 
 [3]
 It is unclear why a second investigation took place. Kamahele testified at her deposition that Maui CPS, which also conducted an investigation, had confirmed Z.D.'s allegations. She thus felt that a second investigation was necessary. The pretrial record, however, is devoid of any evidence that indicates the scope of that investigation, and of any document that indicates why Maui CPS confirmed the allegations
 Ram alleges, to the contrary, that the second investigation was initiated in response to external pressure imposed by Z.D.'s father. On September 10, a California social worker contacted CPS and reported that Z.D.'s father had contacted California officials (where Ram had previously lived) and accused CPS and the Hawaii County Police Department of covering-up Z.D.'s allegations. Also, on September 11, the office of a local politician called Silva and relayed a similar complaint lodged with that office by Z.D.'s father.