202 F.3d 1126 (9th Cir. 2000)
 LAUREN WALLIS, by and through her Guardian Ad Litem, REBECCA LYNN WALLIS, Guardian Ad Litem; JESSIE WALLIS, by and through his Guardian Ad Litem, WILLIAM LAWRENCE WALLIS, Guardian Ad Litem; REBECCA LYNN WALLIS; WILLIAM LAWRENCE WALLIS, Plaintiffs-Appellants,
v.
MARY SPENCER, M.D.; CANDACE YOUNG, PH.D.; RACHEL STECKS; ORDER AND CITY OF SAN DIEGO; CITY OF AMENDED ESCONDIDO; CHILD PROTECTIVE OPINION SERVICES, A DIVISION OF THE SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES; WELLS GARDNER; CATHY MCLENNON; CANELA CAVEDA; SUSAN GOULIAN; GRACE GOODALL; and DOES 1 through 300, Inclusive, Defendants-Appellees.
 No. 97-55579
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted November 6, 1998
Filed September 14, 1999
Amended February 7, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: Paul Leehey, Fallbrook, California, and Donnie Cox, Carlsbad, California, for the plaintiffs-appellants.
 Jeffrey Epp, City Attorney, and Mark Waggoner, Assistant City Attorney, Escondido, California, for the defendantappellee.
 Appeal from the United States District Court for the Southern District of California; Marilyn L. Huff, District Judge, Presiding. D.C. No. CV-93-00135-MLH
 Before: Myron Bright,* Stephen Reinhardt, and Pamela Ann Rymer, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 This case involves a conflict between the legitimate role of the state in protecting children from abusive parents, and the rights of children and parents to be free from arbitrary and undue governmental interference. Such conflicts occur with increasing frequency these days. The problem of child abuse is a critical one, with deep personal and social costs. For too long, intra-familial sexual abuse was considered to be a "private" matter. Today, the law is changing. As we develop a greater awareness of the extent and severity of this difficult and painful problem, society has finally begun to treat intrafamilial child abuse as a serious criminal offense.
 
 
 2
 Because the swing of every pendulum brings with it potential adverse consequences, it is important to emphasize that in the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution. The fact that the suspected crime may be heinous -whether it involves children or adults -does not provide cause for the state to ignore the rights of the accused or any other parties. Otherwise, serious injustices may result. In cases of alleged child abuse, governmental failure to abide by constitutional constraints may have deleterious long-term consequences for the child and, indeed, for the entire family. Ill-considered and improper governmental action may create significant injurywhere no problem of any kind previously existed.
 
 
 3
 Here, the plaintiffs -two young children and their parents -have sued the City of Escondido, among others, for violations of their constitutional rights. Escondido police officers, evidently acting on the basis of a non-existent court order, seized the children, aged two and five, placed them in a county-run institution, and several days later, without obtaining judicial authorization and without notifying their parents, took them to a hospital for the performance of highly intrusive anal and vaginal physical examinations. The children were not returned to their parents for approximately two and onehalf months. All of this occurred after a mental patient who had a long history of delusional disorders and was confined to a mental institution told her therapist a fantastic tale of Satanic witchcraft within her family and an impending child sacrifice. The district court initially granted the City's motion for summary judgment on the erroneous theory that the action was collaterally estopped by a preliminary ruling of the juvenile court referee, and we reversed. Subsequently, the district court again granted the City summary judgment, this time on the merits. Again, we reverse.
 
 BACKGROUND
 
 4
 In September, 1991, Bill and Becky Wallis lived in San Diego with their five-year-old daughter Lauren and their twoyear-old son, Jessie. At that time, Bill had worked at the Lucky Supermarket in San Marcos for over ten years; Becky had worked for a similar period of time at Lucky's in the nearby community of Escondido.[1] Although Bill and Becky Wallis maintained relationships with their parents, the family had had no contact with Becky's sister, Rachel Stecks, for the previous 18 months. Rachel, who suffers from a long history of psychiatric problems, including severe dissociative and multiple personality disorders, had made a false report to the San Diego County Child Protective Services ("CPS") in April of 1990, alleging that Bill was sexually abusing Lauren. CPS had investigated the report and found that there was no credible evidence to support the allegations and no action was taken against the Wallises. Bill and Becky remained angry at Rachel, however, and terminated their relationship with her.
 
 
 5
 The following year, Rachel was hospitalized in a psychiatric facility because she was suicidal and was afraid that she would be murdered. She reported to her therapist in the hospital, Candace Young, that Bill Wallis was planning to sacrifice his young son Jessie to Satan at the "Fall Equinox ritual," and that Bill had told her that Jessie's ritual murder would be covered up by staging a car accident in which his body would be burned. Rachel also told Young that both her parents were in a satanic cult, and that Bill Wallis was also in the cult, but that Becky was not, and indeed "might not know" about her husband's and parents' cult membership. Rachel recounted her recently recovered memory "of being with her father in the woods, with him wearing a cult robe reciting hypnotically `On the third full moon after two blue moons a child will be killed.' " Rachel believed that this incident occurred in 1970, some 20 years before Jessie's birth. One of Rachel's "alter" multiple personalities told Young that the incantation referred to Jessie and meant that he would be sacrificed to Satan on the "Fall Equinox," supposedly one of the Satanic "High Holidays."[2] In 1991, theFall Equinox evidently fell upon September 23, one day before Jessie's third birthday.
 
 
 6
 Young, a marriage and family counselor, was at the time a mandated reporter of child abuse under California law. Rachel's tale (and that of her alters) apparently caused Young some concern; in any event, she telephoned Sue Plante at CPS on September 17, 1991. Plante told Young that she needed more information before she could refer the matter to the child abuse investigation unit. After two days, Young sent Plante a letter. Plante then phoned the child abuse hotline, on September 19, 1991. The referral filled out by the hotline worker -by now a third-hand account of a story told by an institutionalized mental patient -indicates that Rachel reported to her therapist that Bill Wallis was going to sacrifice Jessie to Satan on September 23, 1991. The referral also says that Rachel was currently hospitalized for psychiatric reasons, and that she has "multiple personality and decompensates during cult holidays." In addition, the referral clearly states that, according to the mental patient, Becky "may not know of husband's cult activity," and noted where Bill and Becky worked.
 
 
 7
 Plante also called her supervisor, who advised her to contact the Escondido Police Department, which she did. The Police Department, in turn, assigned the case to Officer Brian Knodel. Plante told Knodel the contents of the referral from Young, including the fact that Rachel wasn't sure that her sister Becky knew about the cult, and also that Young had told her that Rachel's father owned a boat docked in San Diego called "Witch Way." The next day, Knodel reported to Plante that he could not locate the family at the address provided by Rachel because it was over a year old -likely due to the fact that Bill and Becky had cut off contact with Rachel after her earlier false report to CPS -and that he did not attempt to find them at their jobs "because he did not want to alert them to the possibility that we were trying to find the child to intervene."
 
 
 8
 Plante wrote up her recommendations for the CPS caseworker who would be assigned to the matter, stating that she felt "we have no choice but to take the children into protective custody until an investigation can be done." Plante later testified, however, that she had no recollection of telling anyone at the Escondido Police Department or at CPS that the children should be picked up. On September 20, 1991, CPS assigned Karen Cabico to be the "emergency response social worker." In that capacity, she was the case-worker charged with deciding whether the circumstances warranted removing the Wallis children from their home and placing them in foster care. Cabico's notes from September 20 show that she communicated with both Knodel and Plante during the effort to locate the family's home. At some point that day, Plante told Cabico that a district attorney named Jane Via told Plante that "we have enough to pick up the kids."
 
 
 9
 Also on September 20, Knodel wrapped up his involvement in the matter by recommending to his superiors at the Police Department that "this case be submitted to investigations or be followed up by CPS case worker Sue Plante." The Police Department assigned the case to juvenile detectives Diana Pitcher and Ralph Claytor, who continued to search for the family. Cabico testified that she never told Pitcher or anyone else at the Police Department that it was authorized to pick up Lauren or Jessie, but that she did not know whether anyone else at CPS told the police to do so. Pitcher testified that she had no discussion with anyone from CPS about any allegations of sexual abuse concerning either Wallis child, and that all of her conversations with Plante and Cabico involved the supposed "ritual murder" of Jessie. Pitcher also contacted Young, who reiterated the tale told to her by her institutionalized patient. Pitcher later said that "in hermind" she believed Rachel's story because Young had some "expertise " in the area of ritualistic abuse.[3]
 
 
 10
 Pitcher and Claytor both contend that CPS workers Plante and Cabico told them -though neither officer can recall the precise facts or circumstances -that "there was a pickup order." Pitcher testified at her deposition that she did not believe she was responsible for investigating the case, but "was really looking at just picking up the children on the order." She testified that she "knew" that there was a court order though she never saw one and repeated that she was not conducting an investigation but only enforcing the supposed order.[4] Claytor also testified that he was involved in investigating the location of the children in order to enforce the CPS pickup order, but that he was not involved in any investigation of abuse. Pitcher's supervisor, Ken Burkett, also testified that he believed that there was a juvenile court order to pick up the children that had previously been obtained by CPS, and that the Police Department picked them up as it would "normally" do in that circumstance. It is undisputed that no order ever existed and that CPS had not yet even reached a decision about whether to seek protective custody of the children when the police picked them up.
 
 
 11
 During discovery, Pitcher, Claytor, and Burkett all testified that, at the time the Wallis children were seized, the Police Department had in effect a practice of taking "at face value" telephonic representations from CPS that there was a court order to remove children from their parents' custody. Claytor testified that "it was not unusual for CPS workers to call and ask for our units to respond to a particular scene, and tell them that `we have a petition that's been filed,' or kids have already been made a ward of the court in response to a petition. That happened fairly often." Burkett, the supervisor, testified that the Police Department did nothing to verify that a pickup order existed because
 
 
 12
 there's been a longstanding agreement between law enforcement agencies, that if I tell you I have a search warrant, up until recent times, you would be taken at face value that you did, in fact, have a search warrant. Same way as when I call down to verify that there is a warrant in the system for some one and make the arrest, I don't physically see it.
 
 
 13
 Unlike arrest warrants, however, court orders to seize children were not at that time part of any computerized database and there was no established procedure for verifying such orders, by xerox, fax,computer, or otherwise. Indeed, Pitcher testified that in September of 1991 the Department had a settled practice of not confirming CPS representations that there was a court order to pick up children. Pitcher was identified by the Police Department as the person most knowledgeable about the Department's practices regarding taking protective custody of minors, and she was deposed as such.
 
 
 14
 On September 21 and 22, the police continued to look for the family in order to enforce the purported court order, but still did not go to either parent's place of work. An officer finally went to the Lucky's in Escondido on the afternoon of September 22 and discovered that Becky did in fact work there and that she was scheduled to work that evening. The manager of the Lucky's did not have a current home address for Becky. At some point that day, the police also discovered that a boat called "Witch's Way" was berthed at a harbor in the city of Oceanside. They made no inquiry, however, as to the name of the person or persons who owned or used the boat. The officers decided to have a "stake out " in the parking lot of the Escondido Lucky's grocery store. When Becky got off work late that night, three unmarked police cars followed her. Becky later said that she had become frightened when she realized that she was being followed, and even went to the Escondido police station in an effort to get help; however, she was afraid to get out of her car, and drove around in a panic for two hours. At that point, the police realized that their "surveillance had been compromised," and pulled her over in the parking lot of a 7-11 store. There, according to Detective Supervisor Burkett, the officers identified themselves, told her that they needed to "check on" the children, and said that if she took them to her house, they would be able to "sit down and talk about it." Burkett testified, however, that when the officers made these statements to Becky, they did not want only to "check on" the children or talk with the Wallises but they intended to pick up the children based on their belief that there was a court order to do so. In response to the officers' representations, Becky took the officers to the family's home and agreed to their entry.
 
 
 15
 When Becky arrived at her house, accompanied by the police, at around midnight, her children were asleep. The children appeared well-cared for, and Detective Claytor acknowledged that there was no sign of anything suspicious. Nevertheless, Pitcher decided to "interview" Lauren. She required Bill and Becky to awaken Lauren so that she could question her. According to Pitcher, the sleepy five year old was "evasive," but told her that they had to move from the apartment in which they had previously lived because of "spiders on the walls." Although Pitcher acknowledged that she had no information from any source that Lauren had ever been sexually abused, she asked her whether "anybody had ever given her bad touches or abused her." Lauren denied that anyone had.
 
 
 16
 Pitcher then told the parents that their children were being taken away from them. She testified that she took custody of Lauren and Jessie "because of the order . . .[b]ecause of the investigation that had already taken place in CPS. " She stated that she "did not know the specifics of how they[CPS] laid the groundwork to get the kids removed." Pitcher did not interview Becky or Bill because "we had an order and so I wasn't that concerned with it." According to Detective Burkett, who was also present at the time, the police probably told Bill and Becky that there was a court order requiring the police to pick up the children. At 1:00 a.m. on September 22, 1991, Detectives Pitcher and Claytor took Lauren and Jessie to the Hillcrest Receiving Home, a county institution. The children were not allowed to see their parents and cried for them constantly. Lauren and Jessie were not returned to their parents for two and one-half months.
 
 
 17
 Three days after the children were removed from their home, Detective Pitcher picked them up from the county institution and took them to Palomar Hospital, where she ordered, on behalf of the Escondido Police Department, an evidentiary physical examination of both children. No court order was obtained prior to this examination, which was performed in order to determine whether either child had been sexually abused. Nor were the parents notified in advance that the examinations would be conducted. They were not given any opportunity to object to the intrusive examinations, to suggest conditions under which they might take place, or to be present when they occurred. Pitcher testified that she took the children for the examinations "as the officer who had placed the children in protective custody, or at the request of Child Protective Services, or both." CPS insists that the exams were conducted at the City's behest, and the medical report form reflects that the Escondido Police Department was the "requesting agency."
 
 
 18
 The medical procedures, conducted by Dr. Mary Spencer, included internal body cavity examinations of the children, vaginal and anal. Dr. Spencer also took photographs of both the inside and outside of Lauren's vagina and rectum and Jessie's rectum. These examinations were conducted on Jessie's third birthday. A social worker who observed the examinations reported, not surprisingly, that Lauren was very upset by the procedures and asked for her parents. Following the examinations, Dr. Spencer reported to Wells Gardner, CPS's "court intervention worker" that the results disclosed medical evidence that both children had been molested, and that Dr. Susan Horowitz, a specialist from Children's Hospital's Sexual Abuse Unit concurred with her findings. On September 25, 1991, Gardner filed a petition in Juvenile Court alleging that Bill was going to sacrifice Jessie to Satan and that both children had been sexually abused. The Juvenile Court referee specifically rejected the allegations regarding occult sacrifice as a basis for retaining custody of the children, but determined that Dr. Spencer's report provided sufficient evidence of sexual abuse to keep them in county custody. Bill and Becky were granted only one supervised visit per week.
 
 
 19
 Two months went by. Then, on November 25, Dr. Horowitz sent Gardner a letter that changed the lives of the Wallis family. It informed CPS that Dr. Spencer's statement in her report that Dr. Horowitz supported the finding of sexual abuse was false. In fact, Dr. Horowitz wrote, as of the time of Dr. Spencer's report, she (Dr. Horowitz) had not had access to the records of Dr. Spencer's examination, had not performed a full review, and had not offered any conclusion. Dr. Horowitz's letter further stated that she now had reviewed the full file and, based on all the evidence, she did not agree with Dr. Spencer's conclusion that the children had been abused. To the contrary, Dr. Horowitz concluded that there was no evidence of abuse and that there were alternative, normal physiological explanations for what Dr. Spencer had observed. Dr. Horowitz's explanations were based on Lauren's history of vaginal irritation and infection, as documented in her medical records, as well as other information contained in those records. Gardner, to his credit, immediately released the children to their maternal grandmother, and moved swiftly to dismiss the case in Juvenile Court. On December 6, 1991, Lauren and Jessie were returned by court order to the custody of their parents. No one now contends that either child was ever sexually or physically abused, that there was ever any evidence of any abuse by their parents, or that Bill Wallis had ever had any intention of sacrificing Jessie to Satan.
 
 PROCEDURAL HISTORY
 
 20
 All four members of the Wallis family joined in an action alleging the violation of their federal constitutional rights to be free from unreasonable, arbitrary, and undue intrusions on their privacy, person, and home, as well as setting forth various state law claims. CPS, the County, and several other defendants settled with the Wallises; the district court then granted summary judgment to the remaining defendants. The Wallises appealed the district court's ruling. In an unpublished disposition, we reversed as to the City of Escondido, holding that the Wallises' action was not precluded by the juvenile court referee's decision to retain the children in temporary custody on the basis of Dr. Spencer's false report of sexual abuse. We remanded the matter for further proceedings.
 
 
 21
 The district court granted the City's second motion for summary judgment on the theory that none of the Wallises' constitutional rights were violated because the Police Department had reasonable cause to remove the children from their parents' custody with or without a court order, and that the officers had, therefore, acted reasonably. The court then said that even if the Wallises' rights were violated, they had not offered any facts or evidence proving that the Police Department had a policy that caused the violation. The district judge also concluded that the City was immune from any state law remedy because the police officers were "reasonable" both in removing the children from their parents' custody and in subjecting them to the investigatory body cavity examinations. Then, despite the fact that the Wallis family did not sue any officers in their individual capacities, the district court went on to conclude that even if the Wallises' constitutional rights had been violated, the officers were entitled to both absolute and qualified immunity, and that this personal immunity was transferrable to the City itself: "[C]onsequently the city [is] entitled to qualified immunity for their actions in regards to all S 1983 actions alleged by plaintiff." The Wallises appealed.
 
 ANALYSIS
 I. Constitutional Claims
 
 22
 The Wallises allege that the City of Escondido, through the actions of its Police Department, violated the family's constitutional rights by the unlawful removal of Lauren and Jessie from their home in the middle of the night and by the subsequent unlawful detention of the children, including the invasive vaginal and anal examinations. A municipality like the City can be sued for "constitutional deprivations visited pursuant to governmental custom." Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690 (1978). In order to avoid summary judgment, a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation. Chew v. Gates, 27 F.3d 1432, 1444 (9th Cir. 1994); Jackson v. Gates, 975 F.2d 648 (9th Cir. 1992) (city may be liable when its policy is the moving force behind constitutional violation). The Wallises are entitled to prevail on this appeal, therefore, if they introduced sufficient evidence to show that there is an issue of material fact as to whether (1) their constitutional rights were violated; and (2) the violations were caused by a Police Department custom or practice.[5]
 
 A. The Alleged Violations
 
 23
 The Wallises argue that the seizure and removal of the children from their parents' custody in the middle of the night pursuant to a non-existent court order violated their rights under the Constitution. Parents and children have a wellelaborated constitutional right to live together without governmental interference. Santosky v. Kramer, 455 U.S. 745, 753 (1982); Stanley v. Illinois, 405 U.S. 645 (1972); Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925); Meyer v. Nebraska, 262 U.S. 390 (1923). That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency. Stanley, 405 U.S. at 651; Campbell v. Burt , 141 F.3d 927 (9th Cir. 1998); Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1996); Caldwell v. LeFaver, 928 F.2d 331, 333 (9th Cir. 1991); Baker v. Racansky, 887 F.2d 183, 186 (9th Cir. 1988); accord, J.B., 127 F.3d at 927; Croft , 103 F.3d at 1125; Hurlman v. Rice, 927 F.2d74, 79 (2d Cir. 1991); Duchesne v. Sugarman, 556 F.2d 817, 824 (2d Cir. 1977). The Wallises have produced more than enough evidence to create a genuine issue of material fact as to whether the removal of the children from their parents' custody was violative of their constitutional rights.
 
 1. The Non-Existent "Pick-Up" Order
 
 24
 It is now beyond dispute that no court authorized anyone to remove Lauren and Jessie from their home on September 21, 1991. The Wallises contend that the City's police officers removed the children on the basis of a non-existent court order, and have produced substantial evidence that this is what actually happened. Detectives Pitcher, Claytor, and Burkett all testified that they were told by someone at CPS that there was a "pick-up" order and that their task was to locate the family and enforce the order. Detective Pitcher testified in her deposition that she told Bill and Becky Wallis that she was taking their small children away in the middle of the night "because of the order . . . because of the investigation that had already taken place in CPS." Detective Burkett confirmed that the officers probably told Bill and Becky that there was an order requiring the removal of the children. Indeed, the only evidence that could be construed as offering any other reason for the "pick-up" is Detective Pitcher's subsequent statements that appear to contradict her earlier testimony.[6]
 
 
 25
 The testimony of CPS workers regarding what they told the police is somewhat different. Sue Plante testified that she could not recall telling the officers that there was a court order to remove the children; her contemporaneous notes indicate, however, that it is possible that she did advise the police to pick them up. Karen Cabico, the official case-worker, flatly denied conveying any such information to the police; her notes report, however, a phone call from Plante informing her that a district attorney had stated that there was enough evidence to "pick up the kids."
 
 
 26
 The City does not seriously challenge the contention that the officers took custody of Lauren and Jessie because they mistakenly believed that there was an outstanding court order. Nor on this appeal do they separately argue that either a mistaken belief that a court order exists, or reliance on an erroneous statement to that effect from a social service agency worker, satisfies the requirement for a court order or provides reasonable cause, in itself, for the seizure of the children.[7] Instead, confronted with the fact that there was no court order to remove the children from their parents' control, the City contends that the removals were nonetheless lawful, essentially because the facts of which the police were aware regarding the impending Satanic sacrifice of Jessie provided "reasonable cause" to seize the children.[8]
 
 2. Reasonable Cause and Imminent Danger
 
 27
 Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury. Good, 891 F.2d at 1093 (citing Mincey v. Arizona, 437 U.S. 385, 393 (1978)); see also Campbell, 141 F.3d at 927; Franz v. Lytle, 997 F.2d 784 (10th Cir. 1993); Hurlman v. Rice , 927 F.2d 74, 80 (2d Cir. 1991) (collecting cases). The existence of reasonable cause, and the related questions, are all questions of fact to be determined by the jury. McKenzie v. Lamb , 738 F.2d 1005, 1008 (9th Cir. 1984) (per Kennedy, J.); Smiddy v. Varney, 665 F.2d 261, 265 (9th Cir. 1981) (per Sneed, J.) Summary judgment in favor of the defendants is improper unless, viewing the evidence in the light most favorable to the plaintiffs, it is clear that no reasonable jury could conclude that the plaintiffs' constitutional rights were violated.
 
 
 28
 Thus, summary judgment was improper here if a material question of fact exists regarding whether (1) there was reasonable cause to believe, on the basis of the information in the possession of the Escondido police officers, that the Wallis children faced an immediate threat of serious physical injury or death; or (2) the actions taken by the officers -removing the children from their mother and placing them in an institution -exceeded the permissible scope of the action necessary to protect them from that immediate threat. We conclude that there are material disputes of fact with respect to both questions.
 
 
 29
 First, the state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse. Croft v. Westmoreland County Children and Youth Servs., 103 F.3d 1123, 1125; Ram v. Rubin, 118 F.3d 1306, 1311 (9th Cir. 1997) ("An indictment or serious allegations of abuse which are investigated and corroborated usually gives rise to a reasonable inference of imminent danger."); Good , 891 F.2d 1087, 1093 (3d Cir. 1989) (citing Mincey v. Arizona , 437 U.S. 385, 393 (1978)); see also Campbell, 141 F.3d at 927; Franz, 997 F.2d 784; Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir. 1991) (collecting cases). Moreover, the police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been -or will be -committed. See Sevigny v. Dicksey, 846 F.2d 953, 957 (4th Cir. 1988) (holding that child abuse investigator has duty to investigate information that would have clarified matters prior to separating children from their parents); BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) (officer has duty to "make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention"). Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and the nature of the allegations.
 
 
 30
 At the time Lauren and Jessie were removed, the police department had received a report from a mental health worker that an institutionalized mental patient, who had an extensive history of severe delusional disorders and multiple personalities, had told a story of anticipated ritual murder by Jessie's father -a story that would appear to an objective observer clearly to be founded in mental illness. In fact, Detective Claytor later testified that the allegations "sounded a little bizarre" to him, and that he had expressed that opinion to Detective Pitcher at the time. Applying a reasonable cause standard, the juvenile court judge who subsequently heard the dependency petition in this case explicitly rejected those charges as a basis for removing Lauren and Jessie from their parents' custody. Detective Pitcher, however, stated that "in her mind" she believed the story because it was conveyed to her by Young, an "expert."
 
 
 31
 The only other facts on which the City relies to demonstrate that the officers had reasonable cause to believe that there was an imminent threat to the children's welfare at the very most help the City establish that a genuine issue of material fact exists and that summary judgment should not be awarded to the Wallises. See McKenzie, 738 F.2d at 1008. Those "facts," taken together with Rachel's tale as reported by Young, do not by any means justify the conclusion that a reasonable jury would be required to find that the officers had reasonable cause for taking the children into custody. The additional "facts" are as follows: First, the City claims that the officers confirmed that Rachel's and Becky's father, David Stecks, owned a boat named "Witch Way." In fact, the police did not confirm any such thing; according to Detective Claytor, who was the officer searching for the boat, he learned only that a boat with a similar name (Witch's Way) was docked in Oceanside. He did not, however, confirm that the boat was owned, or used, by David Stecks, or by any member of Becky's family. Moreover, the police never conducted any investigation whatsoever into how the boat acquired its name, or whether Stecks had anything to do with naming it. Next, the City relies on the fact that the Wallises had moved from the address Rachel supplied, which the City characterizes as "disappearing from where they were supposed to be." An equally valid inference is that the Wallises' change of address demonstrates the unreliability of Rachel's tip, because important information Rachel provided proved false, and because Rachel lacked knowledge regarding important family matters. Third, Detective Pitcher testified that she accorded significance to five-year-old Lauren's statement about spiders and her "elusive" behavior on being awakened at 1:00 a.m. The Wallises are entitled to the inference that Lauren was drowsy and had nothing adverse to report. In any event, when asked by Pitcher if anyone had ever given her "bad touches," Lauren denied that anyone ever had, which is hardly "elusive."[9]
 
 
 32
 Finally, we note that the tip itself stated that Becky Wallis was probably unaware that Bill was contemplating harming Jessie and was not part of the "plot" to kill her son.[10] Nevertheless, the City acknowledges that its officers did not interview Becky because they mistakenly thought they were enforcing a court order. More important, for this reason, the officers alsodid not undertake any significant investigation into the underlying charge, specifically, the allegation that Jessie would be sacrificed.
 
 
 33
 Under the circumstances, a jury could reasonably conclude that the information possessed by the officers was insufficient to give rise to reasonable cause or that the officers' conduct in failing to investigate the mental patient's bizarre tale before acting was not reasonable. While ordinarily a close relative's tip that a child is about to be killed might provide reasonable cause to believe that an emergency exists and justify a seizure of the child without prior judicial authorization, the facts in this case are far from ordinary. They are, indeed, extraordinary in every sense of the word, including the fact that the close relative had a long history of psychiatric disorders, was confined to a mental institution, and told a tale that was wholly incredible. In any event, given the factual uncertainty regarding the information actually possessed by the officers at the time they removed the children, the contradictions in Detective Pitcher's testimony and sworn statements, the absence of any significant investigation into the allegations, and the extraordinary nature of the allegations, it cannot be said as a matter of law that reasonable cause existed, or that the officers acted reasonably. Viewing the evidence in the record in the light most favorable to the Wallises, we conclude that a reasonable jury could find that the officers did not have reasonable cause to remove the children without a court order.
 
 3. Permissible Scope of the Removal
 
 34
 Even if state action to protect Jessie against future Satanic sacrifice by his father were reasonable under the circumstances, triable issues of fact would exist regarding whether the scope and degree of the state interference was justified by the alleged exigency. Bell, 441 U.S. at 559; Barlow, 943 F.2d at 1138 ("Police officers can proceed without a warrant if they reasonably believe they are confronted with an emergency that threatens life or limb, but the [intrusion] must be strictly circumscribed by the exigencies which justify its initiation."); Franz, 997 F.2d at 791 (intrusion must be "reasonably necessary to alleviate the threat"); Good, 891 F.2d at 1093 (under "very limited exception" to warrant rule, intrusion must be reasonably necessary to alleviate the threat of immediate harm); Hebein, 37 F. Supp.2d at 1043 (holding that danger must justify the degree of interference imposed). Merely because some intrusion on a child's protected privacy and security interests may be reasonable does not mean that any intrusion is.
 
 
 35
 Here, the City asserts that the exigency motivating the officers' decision to remove the children without a court order was the belief that Bill Wallis would sacrifice Jessie to Satan on the "Fall Equinox," which was to occur on September 23, 1991. The City argues in its brief that part of its "reasonable" belief in the credibility of this threat was the information that the "Equinox" is one of the "high holidays " for devil worshipers, "when cultists perform human sacrifices and . . . believe that they derive energy from abusing children on that day." (emphasis added). By the City's own admission, then, the police had no information that Jessie's father's plot extended beyond the Equinox; the imminent danger to Jessie was to occur specifically and only on September 23, 1991, a day after the children's seizure. Thus, there is a genuine issue of material fact as to whether the emergency continued to exist for more than the brief day or two following the time of the children's seizure.
 
 
 36
 Furthermore, as previously noted, the police had no information whatsoever that implicated the children's mother in any past or future abuse. There is no evidence that the children could not have been taken with their mother to a shelter, or placed under some other form of protective custody with her until after the Equinox, or even until some later date. A genuine issue of material fact exists therefore as to whether the removal of the children fromtheir mother's custody, and their placement in a county institution for an indefinite period, was sufficiently "strictly circumscribed by the exigency that justified" the City's intrusion into the children's lives. Good, 891 F.2d at 1093. Such questions are also to be decided by a jury. McKenzie, 738 F.2d at 1008.
 
 4. Subsequent Conduct
 
 37
 The Wallises contend that the violation of their rights occasioned by the City's removal of the children continued for the more than two month period during which the children were detained. During that time, the children were held in Hillcrest Receiving Home, and moved through at least three different "confidential" foster homes. Their parents were not permitted to know their whereabouts and were only allowed one hour of supervised visitation per week. There is evidence in the record that the children were traumatized by the separation and cried constantly for their parents. The Wallises contended below that the City was liable for all the damages that flowed from this entire ordeal because the City's policy was the legal cause of the separation. The City, in response, contended that it could not be held liable for any detention of the children after their removal was approved by the juvenile court. We leave it to the district court on remand to determine whether any City policy could be held to have caused any violation of the Wallises' rights after the date of the juvenile court hearing. With respect to the four-day period between the removal and the court hearing, only one alleged violation of the Wallises' rights merits separate consideration -the subjecting of Lauren and Jessie to invasive vaginal and anal medical examinations at the behest of the Escondido police department.
 
 
 38
 The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state. See Parham v. J.R., 442 U.S. 584, 602 (1979) (holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless "neutral fact finder" determines, through due process hearing, that parent is not acting in child's best interests); see also Calabretta v. Floyd, F.3d (9th Cir. 1999) (holding that "[t]he government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents."). We agree with the Second Circuit which held, in van Emrick v. Chemung County Dept. of Social Servs. , that the "Constitution assures parents that, in the absence of parental consent, [physical examinations] of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances."[11] 911 F.2d 863, 867 (2d Cir. 1990). Barring a reasonable concern that material physical evidence might dissipate, see Schmerber, 384 U.S. at 770, or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations.[12]
 
 
 39
 Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted). Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations -particularly those, such as here, that are invasive or upsetting.[13] The interest in family association is particularly compelling at such times, in part because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events.[14]
 
 5. Conclusion
 
 40
 In light of the above, we conclude that there are genuine issues of fact as to whether the Wallises' constitutional rights were violated when the Escondido police officers took the children into custody, placed them in a county institution, and subjected them to invasive medical procedures. We must still consider, however, whether the City is entitled to summary judgment on the ground that the police officers did not engage in the conduct at issue pursuant to any municipal policy, custom, or practice.
 
 B. Municipal Policy, Custom, or Practice
 
 41
 Next, we must consider whether a material question of fact exists regarding whether the constitutional deprivations (which for purposes of summary judgment we must assume occurred) were caused by a "practice or custom which constitutes . . . standard operating procedure." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). The Wallises adduced testimony from Pitcher, Burkett, and Claytor that there was a practice -a "longstanding agreement," in Burkett's words -of enforcing "orders" to take protective custody of children without ever seeing the order.This is sufficient to raise a genuine issue of material fact regarding the existence of a custom or practice of taking children from their homes based on telephone calls from CPS without adequate safeguards to ensure that the removal is legal.
 
 
 42
 Furthermore, the Wallises presented evidence from which it may reasonably be inferred that the Escondido Police Department customarily took children that it placed at Hillcrest Receiving Home for invasive investigatory examinations at Palomar Hospital without obtaining a court order and without notifying their parents. Detective Pitcher, who ordered the investigatory examinations, acknowledged that she may have done so in fulfillment of her function as the juvenile detective who removed the children from their parents' custody, and that there was a contract between Palomar and the Escondido Police Department for the performance of such investigatory examinations. A reasonable inference may be drawn from this evidence that it was "standard operating procedure" to obtain those examinations without seeking judicial authorization or notifying the parents; indeed, given the absence of any individualized suspicion of sexual abuse, it is difficult to imagine, on the basis of the record before us, why else the Wallis children would have been subjected to the invasive examinations.
 
 
 43
 The Wallises also produced sufficient evidence to create a question of fact for the jury as to whether these customs and practices had a "direct causal link" to the deprivations of the Wallises' constitutional rights detailed above. City of Canton v. Harris, 489 U.S. 378, 385 (1989); Chew v. Gates, 27 F.3d 1432, 1444, 1456 (9th Cir. 1994) (holding that city may properly be held liable where policy is moving force behind constitutional violation); Jackson v. Gates, 975 F.2d 648, 654 (9th Cir. 1992) (holding that city's policy need not be unconstitutional per se, but need only cause a constitutional violation). A reasonable jury could readily conclude, viewing the evidence presently in the record in the light most favorable to the Wallises, that the moving force behind the removal of the children from the parents' custody was the policy of accepting telephonic representations from CPS without any procedure for checking on the accuracy or validity of the supposed orders. See McMurray v. Sheahan, 927 F. Supp. 1082, 1090 (N.D. Ill. 1996) (holding county liable for false arrests when it has no system to check validity of warrants on computer system). That would be true whether a CPS employee had erroneously told the police that a pick-up order existed or whether the police mistakenly believed that a CPS employee had made such a statement. Similarly, a reasonable jury could conclude that the investigatory vaginal and anal examinations were performed on the children pursuant to a Police Department custom and practice of instigating body cavity examinations without first notifying the parents and without seeking prior court authorization whenever its officers place children in protective custody.[15]
 
 
 44
 The district court incorrectly held that even if the City did have policies that caused the deprivations, it was not liable because any absolute and qualified immunities possessed by the individual officers were somehow transferred to the city itself. There are, however, no personal immunities available vicariously or otherwise to municipal actors under S 1983. Leatherman v. Tarrant County Narcotics Unit, 507 U.S. 163, 166 (1993). It appears that the district court also applied state statutory immunities for child abuse investigations to the federal constitutional claims and concluded that the City is immune from a S 1983 action under a state immunity statute. Again, the district court erred. Immunity under S 1983 is governed by federal law; state law cannot provide immunity from suit for federal civil rights violations. Martinez v. California, 444 U.S. 277, 284 (1980); Good v. Dauphin County Social Serv., 981 F.2d 1087, 1090-91 (3d Cir. 1989) (holding that state law providing immunity from suit for child abuse investigators has no application to suits under S 1983). In sum, the City of Escondido has the benefit of neither federal nor state immunity from liability under S 1983 for the alleged violations of the Wallises' constitutional rights.
 
 
 45
 Appellants' evidence regarding municipal custom and practice is sufficient to permit them to survive summary judgment on the Monell issue. Accordingly, we reverse the district court's grant of summary judgment to the City of Escondido with respect to the Wallises' S 1983 claims.
 
 II. State Law Claims
 
 46
 In addition to their constitutional claims, the Wallises sued the City for abduction, assault, battery, and intentional infliction of emotional distress. The district court granted summary judgment to the City on those claims also, holding that the police had "reasonable cause" to remove the children and to subject them to vaginal and anal examinations, and thus violated no state laws. As discussed above, on the basis of the record before us, whether there was reasonable cause for the removal of Lauren and Jessie from their home is a question of fact for the jury; so, too, as we have fully explained, the City is not entitled to summary judgment regarding the physical examinations.
 
 
 47
 The officers contend that under Cal. Govt. Code S 820.2, they -and under state law, by extension, the City -are immune from liability on the state law tort claims.[16] The district court concluded that the police had reasonable cause to seize the children and subject them to the invasive medical examinations, it did not reach the question of immunity. Given the conclusions we have reached, however, it is necessary for us to do so.[17]
 
 
 48
 Under S 820.2, a public employee cannot be held liable for any injury resulting from "his act or omission where the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion be abused." The City correctly asserts that S 820.2 applies to county social workers engaged in investigating allegations of child abuse, and extends to other public employees whom those social workers "reasonably enlist to assist in the investigation." Newton v. County of Napa, 266 Cal. Rptr. 682, 687 (Cal. App. 1990); Alicia T. v. County of Los Angeles, 271 Cal. Rptr. 513, 519-20 (Cal. App. 1990) (holding that social workers' immunity is designed to protect "the continuing exercise of . . . discretion in favor of the protection of minor children"). This immunity provides complete protection for the decision to investigate, to make an "in-person response," and for actions necessary to make a meaningful investigation. It does not extend, however, to non-discretionary actions or to at least some intentional torts committed in the course of making the investigation, such as battery and false imprisonment. Newton, 266 Cal. Rptr. at 687-88.[18]
 
 
 49
 As to the removal of the children, many of the relevant facts are in dispute, including the question whether the police officers took Lauren and Jessie into custody pursuant to a request from CPS, the agency in which the discretion to make such decisions was vested. Summary judgment would not be proper on the basis of so unclear and undeveloped a record. With respect to the vaginal and anal examinations, summary judgment on S 820.2 immunity grounds is equally inappropriate. The Wallises contend that Detective Pitcher was simply carrying out a mandatory municipal policy that did not involve the exercise of any discretion. Should they prevail on their theory, S 820.2 would be inapplicable to that part of their claims.
 
 CONCLUSION
 
 50
 Genuine issues of material fact exist as to whether the City of Escondido is liable, under Monell, for violating the Wallises' constitutional rights with respect to the removal of the children from their home and the City's subsequent conduct, including the invasive body cavity examinations. In addition, genuine issues of material fact exist regarding the City's assertion of immunity under Cal. Govt. Code S 820.2 with respect to the state causes of action. Given the numerous factual disputes in this case, we conclude that summary judgment was improper, and that the Wallises are entitled to pursue both their federal and state law claims.
 
 
 51
 REVERSED and REMANDED for further proceedings consistent with this opinion.
 
 RYMER, Circuit Judge, dissenting:
 
 52
 Whether the summary judgment should be reversed on the only ground urged by the Wallises -that there is a triable issue of fact on whether the City had a policy to pick up children without verifying the existence of a court order and without reasonable cause -is a close question. There is a good argument that, as the district court held, the officers had accumulated reasonable cause in the course of investigating Rachel's allegations, thereby making the nonexistence of the court order immaterial. However, because it is a close question, sending this issue back for trial is within the ballpark.
 
 
 53
 But holding that there is a triable issue of fact on a policy with respect to the medical examinations that was never alleged, never argued, and as to which no evidence was ever adduced as to the City -the only party left in the case -is not in the ballpark.
 
 
 54
 For sure there is evidence in the record about the examinations because Dr. Spencer, CPS, and San Diego County were defendants. However, the Wallises settled their claims against CPS and the County, and Dr. Spencer was dismissed from the case on immunity grounds. The City is the only party to this appeal. Until the majority got its bat on this case, there was no question at all about liability on the part of the City for the medical examinations.
 
 
 55
 I therefore dissent. The possibility of a City policy with respect to medical examinations of children was invented here; the discussion with respect to it is dicta, as it clearly is not necessary to the decision to reverse; and we have no business inventingan issue and a constitutional right or two to resolve it.
 
 
 
 Notes:
 
 
 *
 The Honorable Myron Bright, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 
 
 [1]
 The record is not entirely clear as to the ownership of the stores at which they worked during this period, but that fact is of no import.
 
 
 [2]
 In a subsequent letter to CPS, Young stated with respect to the information that Jessie would be sacrificed by his father: "A child alter of Rachel's named relayed this information to me, however it is not clear which alter actually received this information from her own and Jessie's father. Unfortuneately, (sic) the alters wish to remain anonymous out of fear of punishment for disclosure." The blank space above refers to the alter personality that requested the therapist preserve his or her anonymity. The therapist complied with that request.
 
 
 [3]
 As this litigation has progressed over the years, Pitcher's statements about her telephone conversation with Young have grown more elaborate. Thus, at Pitcher's first deposition in May 1994, she stated that she subjectively thought that the report might be credible based solely on the fact that Young and another doctor, to whom Pitcher never spoke, specialized in ritual abuse. Pitcher did not, in that deposition, testify that Young ever told her that this report was credible or that the Wallis children were in any immediate danger. However, when three years later Pitcher submitted an affidavit in support of the defendant's motion for summary judgment, she reported a different version of her conversation with Young -one in which Young told her that "in her professional opinion Rachel Stecks's report was . . . true and . . . that she had a real fear for the safety of the Wallis children." The two divergent accounts of this telephone conversation, as offered by Pitcher, in themselves create a question of fact and of credibility that can only be resolved by the jury. Moreover, even if Pitcher's most recent account is accurate, whether this conversation supplied sufficient objective facts and information to justify the seizure is a question of fact for the jury. See McKenzie v. Lamb , 738 F.2d 1005, 1008 (9th Cir. 1984) (holding that the existence of probable cause in a S 1983 case is a jury question).
 
 
 [4]
 Once again, Pitcher's testimony has changed as time has passed. In a subsequent deposition and declaration Pitcher offered a different version of these events, insisting that she had conducted an investigation, and had picked up the children after concluding that she had probable cause for such action. Even then, however, she made it clear that at the time she acted she was relying at least in substantial part on a statement from CPS that a pick-up order existed.
 
 
 [5]
 "The Wallises" refers to all four plaintiffs, except where the context reflects otherwise.
 
 
 [6]
 See supra note 4.
 
 
 [7]
 Although we do not consider here the legal consequences of relying on a non-existent order, see note 10, infra , we note that a number of factual issues exist as to what, if anything, the officers were told about a pick-up order for Lauren and Jessie. Such questions are best resolved at trial.
 
 
 [8]
 The claims of the parents in this regard should properly be assessed under the Fourteenth Amendment standard for interference with the right to family association. Campbell v. Burt, 141 F.3d 927 (9th Cir. 1998); Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1991). Because only the children were subjected to a seizure, their claims should properly be assessed under the Fourth Amendment. Donald v. Polk County, 836 F.2d 376 (7th Cir. 1988); but see J.B. v. Washington County , 127 F.3d 919, 928 (10th Cir. 1997) (noting that there may be circumstances in which a parent has standing to bring a Fourth Amendment claim for the seizure of a minor child). As the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children, we analyze the Wallises' claims together.
 
 
 [9]
 The City also cites, as a contributing factor in the reasonable cause calculus, the "fact" that the officers were told by CPS workers about the "pick-up" order. There are two problems with this suggestion. First, what, if anything, CPS told the officers is a disputed question of material fact. Second, there is a substantial legal question as to whether a mistaken belief as to the existence of a warrant or court order, even when based on an erroneous report from another law enforcement officer, can in itself constitute a contributing factor. In the recent case of Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997), the Third Circuit appears to have answered this question in the negative. In Rogers, a state trooper mistakenly believed, based on a conversation with a probation officer, that there was a warrant for Rogers's arrest. That trooper then told two fellow officers that there was an arrest warrant, and all three arrested Rogers on that basis. The Third Circuit concluded that all three officers violated the plaintiff's Fourth Amendment rights. The court went on to say, however, that the second two officers were entitled to qualified immunity, because it was objectively reasonable for them to believe that they were authorized to rely on the clear and unambiguous statements of a fellow officer.
 
 
 [10]
 The tip also stated that Bill supposedly told Rachel that Becky would get over the loss of Jessie, saying "She's not going to miss him. Besides, we've got Lauren. It's not like we don't have our hands full with her. She'll forget about him after a while." This part of the tip suggests that there was never any reasonable cause to remove Lauren even if there were reason to remove Jessie. There were no allegations that anyone planned to harm Lauren or that anyone had ever previously harmed Lauren.
 
 
 [11]
 In our recent decision in Calabretta, we quoted with approval the following language: "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human dignity." Calabretta , F.3d at (quoting Good v. Dauphin County Social Services, 891 F.2d at 1093 (in turn quoting Doe v. Renfrow, 631 F.2d 91, 92-93 (7th Cir. 1980)).
 
 
 [12]
 On rehearing, the City and County of San Diego as amicus curiae argue that these requirements conflict with a state law regarding the medical examinations of children in protective custody. This law, California Welfare and Institutions Code S 324.5, was not enacted until 1998, some seven years after the Wallis children were subjected to the invasive vaginal and anal examinations. Thus, we have no occasion to consider whether or to what extent that law is affected by our decision here. We observe, however, that there is no apparent conflict between the requirements of this opinion and the statute in question. See , e.g., Tenenbaum v. Williams, 907 F.Supp. 606 (E.D.N.Y. 1995) (on denial of rehearing, holding that a New York statute allowing local officials to give consent for medical services for a child in protective custody did not affect the court's conclusion that due process required that the Commissioner of Social Services obtain judicial authorization for a purely investigatory examination issued after notice and an opportunity to be heard had been furnished to the parents), aff'd in part and vacated in part, 193 F.3d 581, 604 (2d Cir. 1999) ("it cannot be said that the requirement of obtaining the equivalent of a warrant where practicable imposes intolerable burdens on the government officer or the courts, would prevent such an officer from taking necessary action, or tend to render such action ineffective").
 
 
 [13]
 See R. Lazebnik et al., Preparing Sexually Abused Girls for Genital Evaluation, 13 ISSUES IN COMPREHENSIVE PEDIATRIC NURSING 155 (1990) (concluding that vaginal examinations are highly traumatic to little girls, particularly when their mothers are absent). A social worker who observed five year old Lauren's vaginal and anal examination reported that Lauren was upset and "under stress" during the examination and asked for her parents. Later, Lauren appeared for an interview with this same social worker clutching a security blanket and a stuffed animal and tearfully asked whether her parents wanted her back or were trying to "get rid of her."
 
 
 [14]
 We note that the claims of each family member must be assessed sep-arately. Here, nothing in the record before us suggests that Becky Wallis was anything other than a fit and loving mother. As the Third Circuit recently held, a state has no interest whatever in protecting children from parents unless it has some reasonable evidence that the parent is unfit and the child is in imminent danger. Croft, 103 F.3d at 1125. The government may not, consistent with the Constitution, interpose itself between a fit parent and her children simply because of the conduct -real or imagined -of the other parent.
 
 
 [15]
 While we determine in the text that there is a genuine issue of material fact as to the existence of a municipal custom or practice of subjecting children, taken into custody due to suspected abuse or neglect, to investigatory anal and vaginal examinations without prior judicial authorization and parental notification, we do not intend to imply that it is necessary for the Wallises to establish the existence of a second and independent municipal policy in order to receive damages for the injuries attributable to the medical examinations of the Wallis children. Rather, we leave it to the district judge and the jury to determine what additional consequences, if any, may flow from the establishment of a separate and additional constitutional violation founded on a separate and independent municipal policy.
 
 
 [16]
 Under state law, the City may be liable for damages inflicted by its employees under the doctrine of respondeat superior. Cal. Govt. Code S 815.2(a). Accordingly, any state law immunity from state law tort claims that is possessed by the employee run to the benefit of the governmental entity. Cal Govt. Code S 815.2(b). By contrast, municipal entities are not subject to respondeat superior liability for federal civil rights claims. See Monell, 436 U.S. at 690.
 
 
 [17]
 The City suggests on appeal that it may be entitled to prosecutorial immunity under Cal. Govt. Code S 821.6, as well. We reject this claim for two reasons. First, the City raised this issue for the first time in its reply brief; it was not properly preserved below, and we need not consider it here. Second, the City repeatedly asserts that it had nothing whatever to do with the prosecution of the juvenile dependency proceeding, which it claims was the responsibility of CPS, a county agency. Given this disclaimer, the City is not entitled to claim the state-law prosecutorial or quasi-prosecutorial immunity which may be available to social workers in child abuse cases.
 
 
 [18]
 We do not decide here which, if any, of the tort claims asserted by the Wallises are not subject to the provisions of S 820.2, preferring to leave that question initially to the district court.