**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| LISA DEMAREE, wife; ANTHONY ("A.J.") DEMAREE, husband; on behalf of themselves and as the natural guardians and guardians ad litem for their three minor children, T.D., J.D., and L.D., *Plaintiffs-Appellants*, <br><br> v. <br><br> LAURA PEDERSON; AMY VAN NESS, *Defendants-Appellees.* | No. 14-16207 <br><br> D.C. No. 2:11-cv-00046-ROS <br><br> ORDER AND OPINION |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Senior District Judge, Presiding

Argued and Submitted July 6, 2016
San Francisco, California

Filed January 23, 2018
Amended April 6, 2018

Before: Marsha S. Berzon, and N. Randy Smith, Circuit
Judges, and Jack Zouhary,* District Judge.

---

* The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

Order;
Per Curiam Opinion;
Separate Opinion by Judge N.R. Smith;
Concurrence by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Zouhary

## SUMMARY[**]

### Civil Rights

The panel issued an order amending Judge N.R. Smith's separate opinion, denying a petition for rehearing en banc on behalf of the court, and ordering that no petitions for panel rehearing or further petitions for rehearing en banc shall be entertained.

The panel affirmed the district court's order denying plaintiffs' motion to seal the district court's summary judgment order, reversed the district court's order granting summary judgment in favor of social workers on the basis of qualified immunity, and remanded for further proceedings.

Plaintiffs alleged that Child Protective Services socials workers violated their and their children's constitutional rights to family unity and companionship by temporarily removing the children from their home without a warrant or court order. The social workers removed the children during a possible sexual abuse investigation after a Wal-Mart employee contacted police that while printing family photos

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

dropped off by plaintiffs, they noticed several pictures portraying child nudity.

The panel first rejected defendants' contention that plaintiffs' appeal was not timely filed because plaintiffs' "lodged" motion to alter or amend the judgment under Federal Rule Civil Procedure 59 could not toll the deadline for appeal under Federal Rule Civil Procedure 4(a)(4). Applying *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 16–17 (2017) the panel held that Rule 4(a)(4) is not jurisdictional but rather is a mandatory claim-processing rule. The panel then held that the appeal was timely because the Rule 59 motion was actually physically delivered to the clerk when it was timely lodged in conjunction with the request to file under seal, and the district court treated the motion as filed when it ruled on the merits of the motion.

The panel held that the social workers were not entitled to qualified immunity. Viewing the facts in the light most favorable to the plaintiffs, the social workers did not have reasonable cause to believe the children were at risk of serious bodily harm or molestation when they removed the children from their home without judicial authorization. The panel further held that plaintiffs' constitutional right was clearly established at the time. The panel held that specific judicial precedent clearly gave notice to the social workers that children could not be removed from their homes without a court order or warrant absent cogent, fact-focused reasonable cause to believe the children would be imminently subject to physical injury or physical sexual abuse.

The panel affirmed the district court order denying plaintiffs' motion to seal the summary judgment order. The

panel held that: (1) the district court properly protected the privacy of the children by maintaining under seal any motions or exhibits containing their full names or identifying information; (2) Arizona law prohibited the release of files related to investigations conducted by child protective services; and (3) the district court order employed clinical, anatomically correct language to briefly describe the nudity depicted in the photographs at issue.

In his amended separate opinion, Judge N.R. Smith explained that in his view the court had neither jurisdiction nor authority to hear this case because the plaintiffs failed to file their notice of appeal within thirty days of the judgment. However, because a majority of the panel believed there was jurisdiction and authority to hear the case, and Judge Smith agreed with the per curiam opinion's resolution of the merits, he joined all but Part II(A)(ii) of the opinion and concurred in the judgment.

Concurring, Judge Berzon wrote separately to emphasize why it is essential that the courts scrupulously guard a child's constitutional right to remain at home absent a court order or true exigency.

Concurring and dissenting in part, Judge Zouhary agreed with the per curiam opinion as it pertained to the timeliness of the appeal and the district court denial of the motion to seal the summary judgment opinion. He respectfully dissented from the majority view on the merits of the case. He would have affirmed the district court order granting summary judgment based on qualified immunity.

**COUNSEL**

Richard R. Treon (argued), Treon & Aguirre PLLC, Phoenix, Arizona, for Plaintiffs-Appellants.

Michael G. Gaughan (argued), Assistant Attorney General; Dominic E. Draye, Solicitor General; Mark Brnovich, United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Defendants-Appellees.

**ORDER**

The separate opinion by Judge N.R. Smith filed on January 23, 2018, and reported at 880 F.3d 1066, is hereby amended. The superseding separate opinion will be filed concurrently with this order.

A majority of the panel has voted to deny the petition for rehearing en banc. Judge Zouhary suggested that the petition for rehearing en banc be granted.

The full court has been advised of the suggestion for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc is **DENIED**.

No petitions for panel rehearing or further petitions for rehearing en banc will be entertained.

**OPINION**

PER CURIAM:[1]

As this court has stated repeatedly, families have a "well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000); *accord Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 789 (9th Cir. 2016) (en banc); *Burke v. Cty. of Alameda*, 586 F.3d 725, 731 (9th Cir. 2009); *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007); *Mabe v. San Bernardino Cty.*, 237 F.3d 1101, 1107 (9th Cir. 2001); *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997). We consider here Lisa and Anthony ("A.J.") Demaree's contention that social workers Laura Pederson and Amy Van Ness violated their constitutional rights to family unity and companionship, and their small children's as well, by removing the children from home without a warrant or court order.

**I. BACKGROUND**

A.J. Demaree dropped off some family photos to be printed at a Wal-Mart in Arizona on Friday, August 29, 2008. While developing the pictures, an employee noticed that several pictures portrayed nude children. Wal-Mart called the police. Detective John Krause came and collected the pictures. On Saturday, he photocopied the ones that concerned the Wal-Mart employee and went to the Demarees' home.

---

[1] Judge Berzon concurs in the entirety of this opinion. Judge N.R. Smith concurs in all but Part II(A)(ii) of this opinion. Judge Zouhary concurs in all but Part II(B)(ii) of this opinion.

Once there, he and his partner separately interviewed parents Lisa and A.J. Demaree. Both parents looked at the pictures, identified their daughters—five-year-old T.D., four-year-old J.D., and one-and-a-half-year-old L.D.—and said the pictures had been taken "in the last couple of months" by one or both parents. When asked what he would do with one photo, which portrayed his three children lying down on a towel nude, focusing on their exposed buttocks but with some genitalia showing, he responded, "I'm not going to do anything with that one. That's not going in a photo album; that's just one we have." Krause said, "Obviously you're not going to share it with somebody, I would hope," to which A.J. responded, "No, absolutely not!" Krause then asked why he would take the photo in the first place, and A.J. responded, "So when we look back on em years later, look at their cute little butts."

None of the photographs portrayed children engaged in sexual activity. None portrayed the children's genitalia frontally.

After the interviews, the detectives took T.D., J.D., and L.D. to forensic and medical exams to investigate possible sexual abuse. The physical exams came back normal for all three children. After the interviews were finished, Krause's partner dropped the children back off with their parents. Krause wrote in his report, "[a]pparently after the forensic interviews and medical exams were completed, [Child Protective Services] declined to remove the children from the parent's custody, and had directed [his partner] to return the girls to Lisa and A.J."[2]

---

[2] Pederson and Van Ness did not rely upon the forensic interviews before or after they decided to remove the children.

While the exams were in progress, the police department requested and received a warrant to search the Demarees' home.  Executing the warrant, the department seized all the evidence that might be relevant to a child pornography investigation: computers, printers, photographs, cell phones, undeveloped film, floppy discs, DVDs, CDs, VHS tapes, and cameras.

As the home search was nearing its end, and after the children had been returned to their parents, Child Protective Services ("CPS") investigating officer Laura Pederson called one of the police officers to discuss the case.  After the conversation, she decided to drive over to the house.  There, Pederson discussed with Krause the evidence seized, the content of the pictures, and Krause's expectation that felony child sexual exploitation charges would be brought against both parents.

After reviewing the evidence Krause showed her, Pederson decided to take the children into emergency temporary custody, without obtaining a court order or a warrant.  She later said, "I was relying on the fact that . . . at the time there was a pending criminal investigation with both parents named as suspects.  I was relying on information that Krause obtained during the investigation . . . his opinion of the criminal acts that were committed, my viewing of the pictures and the fact that the—all of this suggested these children were at risk of further exploitation."  She discussed her recommendation with her supervisor, Amy Van Ness, who agreed.

Pederson gave the parents a "Temporary Custody Notice."  In that notice, in the space provided for investigators to "[c]heck the circumstances (*imminent risk*

*factor*) that most clearly describes the reason temporary custody was necessary," Pederson checked "[o]ther," and wrote, "mother & father have taken sexually explicit pictures of all three children." She did not check the box for situations where "[t]he child's caregiver has engaged in sexual conduct with a child, or has allowed the child to participate in sexual activity with others." On the next page, in the space provided for investigators to inform parents of the "complaint or allegation concerning [their] family [that] is currently under investigation," she wrote, "Sexual Abuse—child pornography/exploitation."

Pederson then drove T.D. and J.D. to one foster home and L.D. to another. Two days later, Pederson brought the children to their grandparents' home, where all three stayed for about a month, after which they were returned to their parents. The juvenile court never adjudicated the children abused or neglected, and neither A.J. nor Lisa were arrested or charged with any crime.

A.J. and Lisa later filed the instant action on behalf of themselves and their children, alleging violations of various constitutional rights. The district court dismissed the claims against all defendants except Krause, Pederson, and Van Ness. The Demarees later settled their claims against Krause.

As relevant here, the district court granted summary judgment in favor of Pederson and Van Ness based on qualified immunity. It ordered the parties to propose appropriate redactions to the summary judgment order, which was temporarily filed under seal on April 23, 2014. On May 21, the Demarees requested leave to file under seal a motion to alter or amend the judgment under Federal Civil Rule 59. Six days later, the district court denied the motion for leave

to file under seal, and also denied the Demarees' request to seal the summary judgment order in its entirety. The Demarees filed this appeal on June 23.

## II. DISCUSSION

### A. Timeliness of the Appeal

Before we address the merits, we consider whether this appeal is timely. Three court rules are pertinent to our inquiry here: First, Federal Rule of Appellate Procedure 4(a)(4)(A) tolls the deadline to file a notice of appeal upon the timely filing of certain motions, including a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59, such that the time to appeal—here, 30 days—runs "from the entry of the order disposing of the last such remaining motion." Second, Federal Rule of Civil Procedure 5(d)(2) provides that "[a] paper is filed by delivering it . . . to the clerk." And third, Arizona Local Rule 5.6(c) requires a document meant to be filed under seal first to "be lodged with the Court in electronic form" using the electronic filing system.

The Demarees accordingly "lodged" a copy of their Rule 59 motion and requested leave to file it under seal. The district court denied the request. But its order, although in form a denial of the request to file the motion under seal, did not refer to or discuss any of the factors relevant to filing documents under seal. *Cf. Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). Instead, the order addressed only the merits of the Rule 59 motion, denying the request to file under seal because the underlying motion was "unnecessary" and "a repeat of arguments previously made, at great length, in Plaintiffs' filings." The Demarees filed

their Notice of Appeal twenty-seven days after the issuance of the order denying leave to file their Rule 59 motion under seal, and fifty-five days after the summary judgment order. Pederson and Van Ness contend that the Demarees' appeal was not timely because the Rule 59 motion was never actually filed and therefore could not toll the deadline for appeal under Rule 4(a)(4).

### (i)  *Jurisdiction versus mandatory claim-processing*

The parties describe the timeliness issue as jurisdictional. Under a recent Supreme Court case, it is not.

"[A]n appeal filing deadline prescribed by statute will be regarded as 'jurisdictional'. . . .  But a time limit prescribed only in a court-made rule . . . is not jurisdictional; it is, instead, a mandatory claim-processing rule. . . ."  *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 16–17 (2017).  In other words, "[i]f a time prescription governing the transfer of adjudicatory authority from one Article III court to another appears in a statute, the limitation is jurisdictional; otherwise, the time specification fits within the claim-processing category."  *Id.* at 20 (internal citations and footnote omitted).

Before *Hamer*, we held the timeliness rule at issue here jurisdictional.  *See United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085, 1100 (9th Cir. 2008), *aff'd and adopted en banc*, *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1167 (9th Cir. 2010) (en banc). *Comprehensive Drug Testing* recognized that "Fed. R. App. P. 4(a)(4) does not contain language from 28 U.S.C. § 2107,"

or any other relevant statute.[3]   But *Comprehensive Drug Testing* regarded *Bowles v. Russell*, 551 U.S. 205, 214 (2007) as indicating that *all* timeliness problems in notices of appeal were jurisdictional, whether directly traceable to a statutory requirement or not.  *Comprehensive Drug Testing*, 513 F.3d at 1100.

*Hamer*, 138 S. Ct. at 21, squarely rejected *Comprehensive Drug Testing*'s reading of *Bowles* in the context of another provision of Fed. R. App. P. 4, Rule 4(a)(5)(C).  That Rule also established a "time prescription . . . absent from the U.S. Code."  *Id.  Hamer* noted that "[s]everal Courts of Appeal . . . ha[d] tripped over [its] statement in *Bowles* that 'the taking of an appeal within the prescribed time is "mandatory and jurisdictional,"'" even though that statement was "a characterization left over from days when [the Supreme Court] w[as] 'less than meticulous' in [its] use of the term 'jurisdictional.'"  *Id.* (internal citations and footnotes omitted).

*Comprehensive Drug Testing* recognized the absence of a statutory basis for Rule 4(a)(4) but—understandably, as *Hamer* recognizes—tripped over the very language in *Bowles* that *Hamer* disavows.  *Comprehensive Drug Testing*'s holding that all timeliness issues in notices of appeal are jurisdictional, even where, as here, the Rule's provision is not statutorily mandated, is thus flatly irreconcilable with *Hamer*. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en

---

[3] *See also Obaydullah v. Obama*, 688 F.3d 784, 788–91 (D.C. Cir. 2012) (describing the relationship between Fed. R. App. P. 4(a)(4) and 28 U.S.C. § 2107, and explaining that the tolling provision of Rule 4(a)(4) has no statutory analog).

banc). Under *Hamer*, Rule 4(a)(4) is not jurisdictional; instead, Rule 4(a)(4) is a mandatory claim-processing rule.

The defendants challenged the timeliness of this appeal in their brief before us, so we must address that question, even though not jurisdictional. *See, e.g., Amalgamated Transit Union Local 1309 v. Laidlaw Transit Servs., Inc.*, 435 F.3d 1140, 1145 (9th Cir. 2006); *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1035–36, 1047 (9th Cir. 2013) (en banc).

### *(ii) This appeal was timely*

Turning to the particular application of Rule 4(a)(4) before us: We recently addressed a similar issue in *Escobedo v. Applebees*, a sex discrimination case. There, Escobedo delivered her complaint to the clerk's office sixty-nine days after receiving her right-to-sue letter from the EEOC. 787 F.3d at 1227. She also filed an *in forma pauperis* application, which was later denied, and she paid her filing fee by the deadline imposed by the court, which fell 133 days after she received the right-to-sue letter. *Id.* at 1230. The defendant argued that the complaint was time-barred because it was "filed" after the ninety-day statutory deadline, even though it was originally submitted to the clerk within the time limit.

The district court dismissed the lawsuit, and we reversed, holding that "[a]s with other pleadings and papers, a complaint is filed 'by delivering it . . . to the clerk.'" *Id.* at 1232–33 (quoting Fed. R. Civ. P. 5(d)(2)). Though Escobedo advanced "constructive filing" and equitable tolling theories, we based our decision on other grounds. We noted that "scant justification exists to invoke" the "legal fiction" inherent in those theories because "[i]t is undisputed that the

complaint was actually, physically delivered to the clerk
. . . ." *Id.* at 1231–32.

Similarly, in *Ordonez v. Johnson*, 254 F.3d 814, 816 (9th
Cir. 2001) (per curiam), we held that a *pro se* prisoner
complaint was timely filed when delivered to the clerk, even
though the clerk rejected the complaint for noncompliance
with a local rule requiring submission of a courtesy copy. We
reasoned that "elevat[ing] a local rule . . . to the status of a
jurisdictional requirement would conflict with the mandate of
Federal Rule of Civil Procedure 1 to provide a just and
speedy determination of every action." *Id.* (internal quotation
marks and citations omitted).

Likewise, in *Klemm v. Astrue*, 543 F.3d 1139 (9th Cir.
2008), Klemm mailed his notice of appeal to the clerk's
office, along with a post-dated check for the filing fee. The
clerk rejected the notice and instructed Klemm to file
electronically, as required by local rule. He did so, but his
electronic filing fell three days after the relevant deadline.
We held the notice of appeal "was deemed filed when it
'arrived in the hands of the Clerk within the statutory
period.'" *Id.* at 1143 (quoting *Loya v. Desert Sands Unified
Sch. Dist.*, 721 F.2d 279, 280 (9th Cir. 1983)). We reasoned
that "filing requirements dictated by local rules are not
jurisdictional. . . . Local rules govern local practice, but a
violation of local rules cannot divest this court of the
jurisdiction afforded to it by Congress." *Id.* (citation
omitted).

In this case, the Demarees' Rule 59 motion was "actually,
physically" delivered to the clerk when it was timely lodged
in conjunction with the request to file under seal. *Escobedo*,
787 F.3d at 1232. And the district court treated the motion as

filed, as it ruled on the merits of the motion.[4]  Accordingly, the time to file an appeal began running from May 27, 2014, the date of the district court's final order, and the Demarees timely filed their Notice of Appeal, on June 23, 2014.

Judge N.R. Smith's separate opinion cites to several cases that distinguish between lodged and filed documents for purposes of determining whether a document is included in the record under Federal Rule of Appellate Procedure 10(a). Separate Opn. of Smith, N.R., C.J., at 33–34 (citing *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1127 n.5 (9th Cir. 2009); *Barcamerica Int'l USA Trust. v. Tyfield Imps., Inc.*, 289 F.3d 589, 594–95 (9th Cir. 2002); *Levald v. City of Palm Desert*, 998 F.2d 680, 684 n.1 (9th Cir. 1993)). Those cases are not relevant here, both because we are addressing a question of timeliness concerning when a pleading was filed, not determining the content of the evidentiary record on appeal, and because the district court resolved the motion on its merits, thereby treating it as if it were filed.

We therefore hold that this appeal is timely.

## B.  Qualified Immunity

We next consider whether Pederson and Van Ness were entitled to qualified immunity when they removed T.D., J.D., and L.D. from their home without judicial authorization.

---

[4] We look to the substance and effect of an order, not solely its title. *See Delta Computer Corp. v. Samsung Semiconductor & Telecomm. Co.*, 879 F.2d 662, 665 (9th Cir. 1989).

Section 1983 provides a remedy for the violation of constitutional rights by any person acting under color of state law. 42 U.S.C. § 1983. But it does not provide a remedy for all constitutional violations. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). We use a two-step test to evaluate claims of qualified immunity, "under which summary judgment is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was 'clearly established' at the time of the violation." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (en banc).

This section 1983 action concerns parents' and children's "well-elaborated constitutional right to live together without governmental interference." *Burke v. Cty. of Alameda*, 586 F.3d 725, 731 (9th Cir. 2009) (internal quotation marks and citation omitted). In particular, "[u]nder the Fourth Amendment, government officials are ordinarily required to obtain prior judicial authorization before removing a child from the custody of her parent." *Kirkpatrick*, 843 F.3d at 790.

There are narrow circumstances in which the government may constitutionally remove children from their families temporarily without judicial authorization. In an emergency, government officials may take a child out of her home and away from her parents without a court order "when officials have reasonable cause to believe that the child is likely to

experience serious bodily harm in the time that would be required to obtain a warrant." *Kirkpatrick*, 843 F.3d at 790 (original italics and internal quotation marks omitted). This requirement "balance[s], on the one hand, the need to protect children from abuse and neglect and, on the other, the preservation of the essential privacy and liberty interests that families are guaranteed under both the Fourth and Fourteenth Amendments of our Constitution." *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007).

### *(i)  Constitutional violations*

The Demarees, on behalf of themselves and their children, claim Pederson and Van Ness violated their clearly established constitutional rights when Pederson removed the children from the home without a court order and absent an emergency.[5]

We begin with the first step of our qualified immunity inquiry—whether the social workers acted constitutionally when they took the Demaree children from their parents without court authorization. "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant." *Rogers*, 487 F.3d at 1294–95 (quoting *Ram*,

---

[5] The Demarees contend, alternatively, that even if the removal itself was proper, Pederson and Van Ness violated their and their children's constitutional rights by placing the children in non-relative foster care, rather than directly placing them with their relatives. Because we agree with the Demarees that the removal was improper, we do not consider this alternative contention.

118 F.3d at 1311).    We therefore consider whether the defendant social workers had reasonable cause to believe that T.D., J.D., and L.D. were at imminent risk of serious bodily injury or molestation. *Wallis*, 202 F.3d at 1138.

Viewing the facts in the light most favorable to the Demarees, the social workers did not have reasonable cause to believe the children were at risk of serious bodily harm or molestation.  Pederson and Van Ness did not represent that the Demaree children might "again be beaten or molested," *Rogers*, 487 F.3d at 1294, if left in their home—the children were never beaten or molested in the first place.  Instead, the articulated concern was that the children could be subjected to future criminal "sexual exploitation" because the parents had "tak[en] sexually explicit pictures of all three children."[6]

It is helpful to identify what this stated risk did *not* include.  The risk identified by the defendants did not include taking photos of a nude child in an exploitative situation and

---

[6] The defendants rely on the investigation into the parents' potential violation of Arizona's criminal law concerning the sexual exploitation of a minor.  Under that law, "[a] person commits sexual exploitation of a minor by knowingly:  1. Recording, filming, photographing, developing or duplicating any visual depiction in which a minor is engaged in exploitative exhibition or other sexual conduct.    2. Distributing, transporting, exhibiting, receiving, selling, purchasing, electronically transmitting, possessing or exchanging any visual depiction in which a minor is engaged in exploitative exhibition or other sexual conduct." Ariz. Rev. Stats. § 13-3553(A).  "Exploitative exhibition" is defined as "the actual or simulated exhibition of the genitals or pubic or rectal areas of any person for the purpose of sexual stimulation of the viewer."  *Id.* § 13-3551(5).  Here, reviewing the facts in the light most favorable to the plaintiffs, there was no evidence that the parents meant to use the photographs for sexual stimulation of themselves or anyone else, much less to take new photographs for that purpose.

distributing them, because there was no allegation or indication that A.J. and Lisa had distributed, or were likely in the future to distribute, nude pictures of their children to anyone.[7] Nor did the identified risk include taking photos of a nude child engaging in sexual conduct, because there was no allegation A.J. and Lisa had ever taken, or were likely to take, photos of their children engaging in sexual conduct.[8] And the risk was not that the Demarees would see their own children, ages five, four, and one-and-a-half, nude, including their genitalia, as caring for children of those ages necessitates doing so.

Most important, the articulated risk—taking sexually explicit photos—did not include any risk of physical sexual abuse. There was no allegation that A.J. and Lisa were likely to put their children at risk of sexual assault or abuse; indeed, after the children were professionally evaluated for signs of sexual abuse, Detective Krause reported that "neither could provide any information relevant to the investigation," and Detective Shearer stated that "[T.D.] and [J.D.] did not make disclosures in the forensic interviews." At the end of the evaluations, Detective Krause reported that "[Child Protective Services] declined to remove the children from the parent's

---

[7] Also, taking the children away would not prevent the parents from distributing existing photographs were they so inclined—which there is no indication that they were.

[8] It would be inappropriate to attach the photographs to this opinion, as doing so could further invade the children's privacy interests in anonymity. We note, however, insofar as Judge Zouhary's dissent suggests that the photographs portrayed the children in "provocative poses," *see* Dissenting Opn. of Zouhary, J., at 46, we see that portrayal of the photographs as inaccurate. The term suggests frontal nudity or sexually explicit poses, neither of which was represented.

custody [*sic*], and . . . directed Detective Shearer to return the girls to Lisa and A.J."

Nor did Pederson act on fear of physical sexual abuse. Before removing the children, Pederson filled out a "Temporary Custody Notice," which included a space instructing investigators to "[c]heck the circumstances (*imminent risk factor*) that most clearly describes the reason temporary custody was necessary." She did not check the box for situations where "[t]he child's caregiver has engaged in sexual conduct with a child, or has allowed the child to participate in sexual activity with others." Instead, Pederson checked "[o]ther," and wrote, "mother & father have taken sexually explicit pictures of all three children."

Further, any cognizable risk could not have been imminent in the sense our case law requires—that the children "might again be beaten or molested during the time it would take to get a warrant." *Rogers*, 487 F.3d at 1294–95. The defendants suggest that we should measure imminence in this case in days and potentially weeks, noting that under Arizona Revised Statute § 8-824(A), the earliest a court could have conducted a full hearing would have been five to seven days after a dependency petition was filed. But Arizona law recognizes that juvenile courts can issue same-day "motions for pickup." *See Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa*, 228 Ariz. 150, 151 (Ariz. Ct. App. 2011) (noting that the department filed a dependency petition and, "[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department's] assertion that the 'child is at imminent risk of abuse and/or neglect due to Mother's substance abuse'"); *see also Tyren T. v. Dep't of Child Safety*, No. 1 CA-JC 16-0091, 2016 WL 4474154, at *1 (Ariz. Ct. App. Aug. 25, 2016); *Michael C. v. Ariz. Dep't of*

*Econ. Sec.*, No. 1 CA-JV 12-0005, 2012 WL 1964581, at \*1 (Ariz. Ct. App. May 31, 2012); *Magdaline L. v. Ariz. Dept. of Econ. Sec.*, No. 1 CA-JV 08-0076, 2008 WL 5403657, at \*1 (Ariz. Ct. App. Dec. 30, 2008).

Here, the parties agree that the juvenile court was not open on Labor Day weekend, when the events in this case occurred. We therefore consider imminence of harm in terms of days rather than hours.[9]

This consideration is straightforward. The defendants did not suggest that there was any possible harm of the requisite sort to the children before the juvenile courts would reopen after the holiday. Again, there was no evidence of sexual assault or abuse; the defendants did not and do not rely on the children's forensic examination and interview as indicating otherwise. Because the defendants did not identify any risk of physical injury or molestation to the children, they did not identify the requisite risk of *imminent* physical injury or abuse.[10]

---

[9] The plaintiffs do not argue that the absence of available judicial officers over the weekend, and the consequent unavailability of a timely judicial determination, constituted a due process violation in itself.

[10] Even focusing—inappropriately—on whether there was evidence that the Demarees would likely take more nude pictures of their children, or distribute new or existing pictures, in the few days before the government could get a court order, there was no such evidence. At the time she removed the children, Pederson did not identify any imminent future photography on her notice of temporary removal; rather, she noted that "mother & father *have taken* sexually explicit pictures of all three children" (emphasis added). It does not appear that Pederson reasonably could have identified more photography as an imminent risk, because the police had taken from the Demarees' home all the cameras, cell phones, computers, and printers found (in addition to potentially relevant

In sum, viewing the record most favorably to the Demarees, there was no suspected risk to the children of serious bodily harm, including molestation, imminent or otherwise. Therefore, viewing the record most favorably to the Demarees, the defendants acted unconstitutionally in taking the three children away from home without judicial authorization.

### (ii) Whether the constitutional right was clearly established

We move to the second step of the qualified immunity inquiry—whether the relevant judicial precedents at the time of the incident clearly gave notice that what happened here violated the Demaree family's Fourth and Fourteenth Amendment rights. We conclude that the applicable precedents did provide that notice.

In 2007, the year before the events in this case took place, *Rogers* held that a social worker violated a family's clearly established federal rights by removing children with no warrant because of reports that a three-year-old and five-year-old "were not toilet-trained, were locked in their rooms at night and in a room at their parents' business during the day, were not receiving medical or dental care, that [one] had lost his teeth due to bottle rot, that [the other] was still being fed with a bottle, that their home was dirty and maggot-infested, and that there were unsecured guns in the home." *Rogers*, 487 F.3d at 1291. The social worker in that case "could have

---

photographs, undeveloped film, floppy disks, DVDs, CDs, and VHS tapes), as they explained to Pederson before she removed the children. And, again, there was no evidence that the parents had ever distributed or had any intent to distribute the photos.

obtained a warrant within hours," and "[t]here [was] no indication in the record that so short a delay could have resulted in a significant worsening of the children's physical conditions or an increase in the prospects of long-term harm." *Id.* at 1295. One child's "'pain' was not so serious that he ceased to be 'playful' and 'alert,'" the physical risk the children faced from being locked in a room for the time it would take to obtain a warrant was "very low," and "the mess in the Rogers living quarters . . . was a chronic, ongoing problem." *Id.*

Even in the face of this significant accumulation of neglect and bodily harm, which all parties agreed had resulted in bodily injury to the small children, we held that there was no reasonable cause to believe an exigency supported the children's warrantless removal. *Id.* at 1296. We concluded that their removal therefore violated their clearly established rights. *Id.*

Here, there had been *no* actual or threatened physical harm to or physical sexual abuse of the Demarees' children before they were taken from their home. So the likelihood that they would suffer such abuse in the days it would take to get a warrant was necessarily less than the likelihood of future physical injury to the Rogers' children in the hours it would take to get a warrant.

Similarly, in *Mabe v. San Bernardino Cty.*, 237 F.3d 1101, 1109 (9th Cir. 2001), viewing the facts in the light most favorable to the plaintiff family, we held that a jury could have found that a defendant social worker violated a mother's clearly established constitutional rights by removing her teenage daughter from her home without a warrant. We were unpersuaded that the sexual abuse allegations were exigent as

a matter of law, even though the teenager's stepfather sexually abused her by "touch[ing] her breasts and crotch area through her clothing at night in her bedroom . . . every other night for . . . two or three months." *Id.* at 1104–05. We reasoned that, "[a]lthough the conduct by the stepfather was clearly inappropriate, it did not involve violence or penetration and the only time it had taken place was at night when MD was in her bedroom. Assuming that [the worker] could obtain a warrant the same day . . . , it is difficult to understand how the further delay of a few hours necessary to obtain the warrant would have put MD in imminent danger of serious physical injury." *Id.* at 1108 (internal footnote omitted). That conclusion was further underscored by the fact that the social worker "opted to leave MD in the residence after interviewing MD and Mabe about the alleged molestation."[11] *Id.*

Despite quite serious allegations of physical sexual assault and bodily injury in *Mabe*, we were unwilling to hold as a matter of law that there was reasonable cause to believe there would be "*imminent* danger of future harm" within the time it would take to get a warrant. *Id.* We held, instead, that "a reasonable jury could conclude that [the mother's] constitutional rights were violated," *id.* at 1109. We do the same here.[12]

---

[11] Similarly here, Child Protective Services initially returned the children to their parents.

[12] Cases applying *Rogers* and *Mabe* after the events giving rise to this case, while not directly applicable to the clearly established law inquiry, confirm our understanding of *Rogers* and *Mabe*. We have continued to be careful to emphasize the need for a clear showing of both imminence and specific, serious physical danger to the child. For example, in *Burke v. Cty. of Alameda*, 586 F.3d 725, 731–32 (9th Cir. 2009), we held that,

The defendants disagree with the above analysis. They suggest that cases in the Ninth Circuit do not clearly establish the constitutional requirements for warrantless removals of children in the event of allegedly exploitative photos of nude children because those cases deal with other forms of sexual abuse and involve court orders available within a few hours rather than a few days.

When evaluating qualified immunity claims, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). It is "beyond debate," *id.*, that existing Ninth Circuit precedent establishes that children can only be taken from home without a warrant to protect them from imminent physical injury or molestation in the period before a warrant could be obtained. *See Mabe*, 237 F.3d at 1108–09. The clearly established case law requires articulable, imminent, and serious physical injury or physical abuse to children to justify removing them from their parents' home without a judicial order. There was no such injury identified here.

Put another way, to say a child can be removed *only* if *x* is likely to happen necessarily means she cannot be removed if there is no indication that *x* is likely to happen. That there is no case law concerning a situation in which *y*, but not *x*, may be likely to happen does not make the rule setting the

under circumstances of that case, in which a stepfather's sexual abuse and physical violence could recur at any time according to the child's report of abuse, there was reasonable cause to believe that an imminent risk of serious bodily injury justified a the child's warrantless removal. We reiterated that "[p]olice officers must have specific, articulable evidence . . . that a child is in imminent danger of abuse." *Id.* at 731 (internal quotation marks omitted).

standards for removal any less clear—the rule is that only a reasonable fear of *x*, not *y*, can provide a constitutional basis for exigent removal.

Here, the rule remains that there can be no removal without a court order "absent evidence that the child was in imminent danger of serious bodily injury." *Kirkpatrick*, 843 F.3d at 792. The risk identified here simply does not meet that standard, as it does not involve physical injury or abuse.

Notably, unlike in *Kirkpatrick*, the issue here is not the *level* of risk in a particular circumstance. *See id*. In that case, a mother who had abused methamphetamine gave birth to a child and, although both stayed in the hospital to recover, several social workers assumed temporary custody of the newborn without a warrant. *Id.* at 786–87. Because no case had addressed the level of risk of physical harm at issue where a potentially abusive mother is in the hospital but could leave with the child, we held that the social workers were entitled to qualified immunity. *Id.* at 793. Here, though, the social workers never identified *any* risk of harm to the children over the applicable period that comes within the exigent circumstances standard articulated in *Wallis* and its progeny.

Further, the case law was clear in 2008 that it does not matter whether the warrant could be obtained in hours or days. What matters is whether there is an identifiable risk of serious harm or abuse *during whatever the delay period is*. *See Rogers*, 487 F.3d at 1294–1295 ("Serious allegations of abuse that have been investigated and corroborated usually give rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody if

they might again be beaten or molested *during the time it would take to get a warrant*." (emphasis added and internal quotation marks omitted)); *United States v. Echegoyen*, 799 F.2d 1271, 1279 n.5 (9th Cir. 1986) ("Exigent circumstances necessarily imply that there is insufficient time to get a warrant."); *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986) ("Exigent circumstances alone . . . are insufficient as the government must also show that a warrant could not have been obtained in time.").

We note that at least one other federal court of appeal has dealt with facts similar to those before us. In *Malik v. Arapahoe Cty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1309 (10th Cir. 1999), the Tenth Circuit held that, viewing the facts in the light most favorable to the Maliks, a police officer and social worker could have violated Ms. Malik's and her four-year-old daughter's clearly established constitutional rights. The defendants had removed the daughter on the authority of a court order obtained through misrepresentation several weeks after they had discovered a set of ten photographs portraying the daughter partially clothed, "some with full frontal genital exposure." *Id.*[13] The daughter's uncle, an artist, had taken the photos five months earlier, and the mother had sent the photos to be processed; as here, the photo processing center called the police. *Id.*

The Tenth Circuit held that the defendants were not entitled to qualified immunity. *Id.* at 1315. That "conclusion hinge[d] upon the district court's finding that '[d]efendants acknowledged [the daughter] was in no imminent danger at the time they sought the order and the facts suggest[ed] [the warrant] was secured only through distortion,

---

[13] None of the photographs here at issue meets that description.

misrepresentation and omission.'" *Id.* at 1315 n.5. In the absence of imminent danger that the daughter would be the subject of more photographs—even if the sexual exploitation inherent in the existing ones would have justified removal—the government could not remove the daughter without a legitimate judicial order. Clearly established law, said the Tenth Circuit, compelled that conclusion.

To recap: We do not here deal with a "general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment," which "is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. Instead, we have here a very specific line of cases, culminating in *Rogers* and *Mabe*, which identified and applied law clearly establishing that children may not be removed from their homes without a court order or warrant absent cogent, fact-focused reasonable cause to believe the children would be imminently subject to physical injury or physical sexual abuse. *Rogers*, the last in the series before the events in this case, summarized that law and explained why qualified immunity was inapplicable: "Prior to the events in question, we had repeatedly held that a family's rights were violated if the children were removed absent an imminent risk of serious bodily harm. A reasonable social worker would need nothing more to understand that she may not remove a child from [his or her] home on the basis of a [situation] that does not present such a risk." 487 F.3d at 1297. *Mabe*, *Rogers*, and their predecessors thus gave clear notice of the law to social workers responsible for protecting children from sexual abuse and families from unnecessary intrusion.

We accordingly reverse the district court's grant of qualified immunity to Pederson and Van Ness.

## C. Motion to Seal

"[C]ourts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (footnotes omitted). We therefore "start with a strong presumption in favor of access to court records." *Foltz*, 331 F.3d at 1135. "A party seeking to seal a judicial record . . . . must 'articulate[ ] compelling reasons supported by specific factual findings.'" *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Foltz*, 331 F.3d at 1135). "'[C]ompelling reasons' sufficient to outweigh the public's interest in disclosure" exist when court records might "'become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179 (quoting *Nixon*, 435 U.S. at 598). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.*

The Demarees' arguments can be summarized as follows: (1) sealing the summary judgment order is necessary "to protect[ ] the privacy and innocence of children"; (2) Arizona law provides that records related to CPS investigations are confidential; and (3) the unsealed order could be used for improper purposes, such as to provide "sexual[ ] stimulat[ion]."

None of these are compelling reasons for sealing the order here. First, the district court properly protected the privacy of the children by maintaining under seal any motions or exhibits containing their full names or identifying information. Second, Arizona law prohibits the Department of Economic Security from releasing "files that contain information related to investigations conducted by child protective services." Ariz. Rev. Stats. § 41-1959(A). It also provides that "records of . . . dependency proceeding[s] shall not be open to public inspection." Ariz. Rev. Stat. § 8-208(F). But the summary judgment order neither releases any CPS files nor opens the records of any dependency proceeding. In short, the district court did not violate Arizona law by publishing the order.

Finally, the district court order employed clinical, anatomically correct language to briefly describe the nudity depicted in the photographs at issue. The unquantifiable odds that an unsavory individual might find this language titillating does not create a compelling reason for removing it from the public record—especially since the Demarees did not file their Complaint under seal, and in fact gave public interviews in which they, themselves, described the photos and the nudity depicted.

### III. CONCLUSION

We affirm the district court order denying the Demarees' motion to seal the summary judgment order. We reverse the district court order granting summary judgment in favor of

Pederson and Van Ness based on qualified immunity. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

N.R. SMITH, Circuit Judge, joining the per curiam opinion, except for Part II(A)(ii), and concurring in the judgment:

In my view, the court has neither jurisdiction nor authority to hear this case.[1] The Plaintiffs failed to file their notice of appeal within thirty days of the judgment, thus we have no jurisdiction or authority over this appeal. However, because a majority of the panel believes we do, and I agree with the per curiam opinion's resolution of the merits, I join all but Part II(A)(ii) of the per curiam opinion and concur in the judgment.

In order to overcome this lack of jurisdiction and lack of authority, the majority concludes that a "lodged" document has "filed" status, allowing the Plaintiffs more time to file the notice of appeal. There is no support for that position. We have no authority to hear this case.

---

[1] I agree with the Majority that *Hamer v. Neighborhood Housing Services of Chicago*, 138 S. Ct. 13 (2017), clearly articulated the difference between jurisdictional rules (those grounded in the United States Code) and "mandatory claim-processing rules" which "must be enforced," but, nevertheless, may also be waived or forfeited, and that the rule primarily at question in this case (Rule 4(a)(4) and the effect of the tolling motions listed therein) is a "mandatory claim-processing rule" and not a jurisdictional rule. *Id.* at 17.

The district court entered summary judgment on April 23, 2014. From that date, the Demarees' time to either file a notice of appeal (30 days), Fed. R. App. P. 4(a)(1)(A), or a Rule 59 motion (28 days), Fed. R. Civ. P. 59(e), began to run.

First, because a notice of appeal was not filed by May 23, 2014 (it was actually filed on June 23, 2014), this court does not have jurisdiction. 28 U.S.C. § 2107(a). "[T]he taking of an appeal within the prescribed time is 'mandatory and jurisdictional.'" *Bowles v. Russell*, 551 U.S. 205, 209 (2007) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 61 (1982) (per curiam)). There is no dispute the Demarees did not file a timely notice of appeal.

Second, because the Rule 59 motion was not filed by May 21, 2014, there is no tolling of the time to file a notice of appeal under Rule 4(a)(4)(A). Instead, the Demarees filed a motion to seal on May 21, 2014 and lodged their Rule 59 motion the same day, allowing themselves the option not to file it in the future. Beyond the exceptions contained in Appellate Rule 4 (in this case the filing of a Rule 59 motion), "[w]e do not have authority . . . to create additional exceptions based on our own sense of what is equitable or fair." *Melendres v. Maricopa Cty.*, 815 F.3d 645, 649 (9th Cir. 2016). Our court is, quite simply, not "at liberty to overlook a defect with the notice of appeal[,] no matter how compelling an appellant's argument may be." *Id.* "If properly invoked, mandatory claim-processing rules *must be enforced*, but they may be waived or forfeited." *Hamer*, 138 S. Ct. at 17 (emphasis added).[2] Therefore, neither the fact that it may be

---

[2] There is no question the Defendants did not waive or forfeit this argument: "The Demarees filed a timely Notice of Appeal (ER 19) as to postjudgment orders (ER 1,3), but not as to the Judgment (ER 4)."

a sympathetic situation, nor the fact that the district court addressed the merits of a lodged motion, are exceptions we can invoke to create authority to hear a case where there is none. The notice of appeal was not filed on time because the underlying Rule 59 motion was never actually filed with the district court.

The majority errs in its effort to remedy the situation, because there is a fundamental difference between a "filed" document and a "lodged" document; a "lodged" document is *not* before the court for consideration. "A document not suitable for filing will normally be stamped 'lodged' and placed in the court file but not included in the record on appeal." *File*, *Black's Law Dictionary* (10th ed. 2014). As such, authority over this appeal is precluded by operation of law.

We have previously addressed whether "lodged" filings are before the court and considered "filed" for purposes of litigation. The short answer is no. In *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116 (9th Cir. 2009), the plaintiff had moved to file a sur-reply (which had a crucial employee handbook as an exhibit) with the district court. *Id.* at 1127 n.5. The sur-reply was considered "lodged" while the district court considered the motion to file the sur-reply. *Id.* Ultimately the district court denied the motion to file the sur-reply and, on appeal, we held that a merely "lodged" document is not part of the record for appeal. *Id.*; *see also Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595 (9th Cir. 2002) (holding that while arguments that lodged documents were before the court were "interesting," they were nonetheless meritless because a lodged document was not filed); *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 684 n.1 (9th Cir. 1993) (holding an

amended complaint was not part of the record on appeal because it was "lodged with, but not accepted for filing by, the district court"). These cases are on point and explicitly resolve whether a "lodged" document is considered "filed."[3] The Demarees did not "file" the motion for reconsideration. It was lodged while awaiting a ruling on the motion to file under seal. After denial, the motion was considered to never have been filed, and, thus, it did not toll the time to file a notice of appeal per Appellate Rule 4(a)(4)(A).

The cases, cited by the Majority, also reflect this understanding. Those cases each demonstrate that a plaintiff (affirmatively seeking to actually publicly file a document) is not barred from filing due to either technical difficulties or a filing fee waiver request. In *Klemm v. Astrue*, 543 F.3d 1139 (9th Cir. 2008), and *Ordonez v. Johnson*, 254 F.3d 814 (9th Cir. 2001), the plaintiffs *sought* to file the complaint or administrative appeal, but were barred by technical rules regarding *how* to file. *Klemm*, 543 F.3d at 1143 ("Thus, a notice of appeal is filed when it is received by the clerk, notwithstanding deficiencies *in form* that violate local rules." (emphasis added)); *Ordonez*, 254 F.3d at 816 (holding that paper filing, instead of electronic filing per the local rule, meant the complaint was "constructively filed"). Similarly, the plaintiff in *Escobedo v. Applebees*, 787 F.3d 1226 (9th

---

[3] The Majority mischaracterizes these cases, suggesting they are inapplicable because the question before the panel is timeliness, not a question of the evidentiary record on appeal. Indeed, by the same reasoning, the Majority's cases are inapplicable because they involve complaints or administrative appeals, not Rule 59 motions. The proper question is whether a given document was properly before the court or not; i.e., whether it was "filed" or "lodged." In this regard, *Nicholson*, *Barcamerica*, and *Levald* are on point, because they answer whether a "lodged" document is "filed": the precise question before the panel.

Cir. 2015), sought to actually *file* her complaint; the filing barrier was her request to file without paying the filing fee. *Id.* at 1231–33 ("No justification exists to alter the definition of 'filing' simply because a complaint is submitted to the clerk's office along with an IFP application."). Unlike this case, the plaintiffs in *Klemm*, *Ordonez*, and *Escobedo* did not "lodge" their complaints or motions while awaiting filing or a ruling. Further, the plaintiffs in those cases each sought to file their complaint *as is*, not under seal, or if the motion to seal was denied, revised so as to protect the information they initially sought to place under seal.

Here, the Demarees understood that the motion was *not* actually before the court. The Arizona District Court's local rules (AZ LR) specifically require a movant seeking to file a document under seal to *file* the motion to file under seal and "[t]he document or documents that are the subject of any such motion or stipulation must not be appended to the motion or stipulation, and must be *lodged* with the Court separately." AZ LR 5.6(b) (emphasis added). The consequences of the court denying a request to file under seal are explicit: "[i]f a request to file under seal is denied in part or in full, the lodged document will *not* be filed." AZ LR 5.6(c) (emphasis added). Further, if the court does deny a request to file under seal, the party has five days to file the motion publicly. AZ LR 5.6(e). There can be no question the Demarees knew their document was not filed.

By seeking to file under seal, it is obvious that the Demarees did *not* want the motion publicly filed. After the District Court rejected the Plaintiffs' motion, it was the Plaintiffs' decision to (1) file publicly; (2) revise and file publicly; or (3) not file the motion. It was the Demarees' decision and the local rule respects that right.

To accord the Plaintiffs "an out," the Majority argues it has authority over this case by giving credence to the fact that the district court comments on the merits of the lodged motion in its denial of the Demarees' motion to seal. In response, the Majority, first, cites no actual legal authority for this argument, because there is none. Second, although the district court discusses the merits of the lodged motion, the ultimate ruling is that the "Motions to Seal (Doc. 363 and 370) are **DENIED**."[4] Third, the Rule 59 motion was never actually before the district court in order for it to consider the motion. The local rule required that the lodged motion "must *not* be appended to the motion [to seal]." AZ LR 5.6(b) (emphasis added). Accordingly, the district court could only consider the merits of only the motion to seal because that was the only document before it. Indeed, the lodged document, in essence, disappears if the motion to seal is denied: "[i]f a request to file under seal is denied in part or in full, the lodged document *will not be filed*." AZ LR 5.6(e) (emphasis added). Although, generally, "[a] paper is filed by delivering it: (A) to the clerk," Fed. R. Civ. P. 5(d)(2)(A), the Demarees did not "deliver[]" the Rule 59 motion "to the clerk" to file it. *Id.* By lodging the document, the Demarees explicitly stated they wanted it to remain *un*filed until the

---

[4] Document 363 was a motion to file under seal to supplement the record in support of their Rule 59 motion and Document 370 was the motion to file the Rule 59 motion under seal.

Further, the Demarees have not appealed the district court's denial of their motions to seal arguing the district court abused its discretion by not considering the merits of the sealing, but rather to deny the motion to seal based on the merits of the lodged Rule 59 motion. This issue, thus, is waived on appeal. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

district court granted the motion to seal. After the district court denied their motion to seal, the Demarees had five days to file their document publicly, which they did not do.[5] AZ LR 5.6(e). Thus, the document was never before the district court to consider, much less somehow confer authority on this court by considering the merits of a lodged motion.

Accordingly, this case is not properly before us for lack of jurisdiction and timely filing of a tolling motion.

BERZON, Circuit Judge, concurring:

I concur in the per curiam opinion in full. I write separately to emphasize why it is essential that the courts scrupulously guard a child's constitutional right to remain at home absent a court order or true exigency.

Taking a child from his or her home, family, and community constitutes a separate trauma, in and of itself. Our cases so recognize, and so ordinarily permit that trauma to occur only after a court determination that the alternative is worse.

---

[5] If the Demarees had filed their Rule 59 motion publicly within five days after the district court entered its denial, they would have a much stronger argument that their situation was akin to the plaintiff in *Escobedo*, where the district court gave the plaintiff thirty days to pay her filing fee after denying her motion to proceed without paying it. *Escobedo*, 787 F.3d at 1228. Escobedo paid the filing fee within the deadline set by the district court and, on appeal, this court held the filing was timely. *Id.* at 1233–34. This, however, is not what the Demarees did.

Nearly two decades ago, we described the purposes underlying constitutional restrictions on removal of children from their homes without any judicial supervision:

> The problem of child abuse is a critical one, with deep personal and social costs. For too long, intra-familial sexual abuse was considered to be a "private" matter. Today, the law is changing. . . .
>
> Because the swing of every pendulum brings with it potential adverse consequences, it is important to emphasize that in the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution. The fact that the suspected crime may be heinous—whether it involves children or adults—does not provide cause for the state to ignore the rights of the accused or any other parties. Otherwise, serious injustices may result. In cases of alleged child abuse, governmental failure to abide by constitutional constraints may have deleterious long-term consequences for the child and, indeed, for the entire family. Ill-considered and improper governmental action may create significant injury where no problem of any kind previously existed.

*Wallis v. Spencer*, 202 F.3d 1126, 1130–31 (9th Cir. 2000).

In other words, for children in neglect and abuse proceedings, "entry into foster care br[ings] them the

additional trauma of separation from their homes and often their communities." 42 U.S.C. § 5111(a)(2) (findings supporting the federal Child Abuse Prevention and Treatment Act). "The events of the day of placement constitute a crisis for children because everything in their lives changes and the children are overwhelmed with feelings of abandonment, rejection, worthlessness, guilt, and helplessness." Rosalind D. Folman, *"I Was Tooken": How Children Experience Removal from Their Parents Preliminary to Placement into Foster Care*, ADOPTION QUARTERLY, no. 2, 1998, at 7, 12 (evaluating the experiences of 90 children removed from their homes as a result of abuse and neglect).

Research confirms that "unexpectedly being snatched by the police or protective service workers traumatize[s] . . . children." *Id.* at 29; *see also* Amy J.L. Baker et al., *Foster Children's Views of Their Birth Parents: A Review of the Literature*, 67 CHILDREN AND YOUTH SERVS. REV. 177, 180–81 (2016) (conducting a meta-analysis of 27 studies of the experiences of children and youth in foster care, and finding strong evidence that children remain attached to their homes and families despite abuse). For small children especially, being taken from a home and family by a stranger is a profoundly frightening and destabilizing experience, even if that home and family are flawed.

By assuring close judicial supervision of even temporary governmental interference in the parent-child relationship—absent reasonable cause to believe a true, identifiable, serious exigency exists—our case law implements the Fourth and Fourteenth Amendment's protection of vulnerable children and their parents. Because our decision today reaffirms that critical principle, I concur.

ZOUHARY, District Judge, concurring and dissenting in part:

I concur in the per curiam Opinion regarding the timeliness of the appeal and the district court denial of the motion to seal the summary judgment opinion.  But I respectfully dissent from the majority view on the merits of the case.  I would affirm the district court order granting summary judgment based on qualified immunity.

### Constitutional Violations

A government official who removes a child from parental custody without judicial authorization must have reasonable cause to believe that the child is at risk of abuse during the time necessary to obtain a court order.  *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294–95 (9th Cir. 2007).  Thus, whether an emergency removal is permitted depends on both the amount of time required to obtain a warrant and the nature of the allegations.

In cases where children were not in immediate physical danger and a warrant could be obtained "within hours," this Court concluded that the exigent circumstances requirement was not met.  *See Rogers*, 487 F.3d at 1295 ("There is no indication in the record that so short a delay could have resulted in a significant worsening of the children's physical conditions or an increase in the prospects of long-term harm."); *Mabe v. San Bernardino Cty.*, 237 F.3d 1101, 1108 (9th Cir. 2001) (holding questions of fact remained on the issues of exigent circumstances, given that the sexual abuse last occurred more than a month before the removal, and a warrant likely could have been obtained within "a few hours").

In this case, Pederson presented evidence that obtaining a court order would take her days, not hours.  Assuming, as the majority suggests, that Pederson could have obtained a warrant on a pre-hearing motion for pickup—which neither side argued before the district court—the earliest she could have been heard was the Tuesday following the Labor Day holiday.  Against this time line, Pederson had to evaluate the following information:

- A Walmart employee was concerned when he discovered photos of naked children on the Demarees' memory stick, and he notified the police;

- Krause reviewed the photos, interviewed the parents, served a search warrant at the Demarees' residence, and seized various cameras, computers, film, and other photos;

- The children were interviewed and medically examined.  During the forensic interview, one of the children reported that their mother "tickle[d] around her private."  The interviewer recommended that the children have no contact with their father pending completion of the investigation;[1]

---

[1] As both the majority and the district court note, Pederson and Van Ness do not suggest they relied on the results of the forensic interview in making the decision to remove the children.  Nevertheless, the record reflects that Pederson was aware of this information at the time.

- The physical exams were all normal, but the assessment noted that "[a] normal genital exam does not preclude the possibility of inappropriate sexual contact [sic] the concern described in the history. Many types of sexual abuse do not have associated physical findings significant enough to be found on medical exam;"

- Krause informed Pederson that at least five of the photos met the statutory definition of sexual exploitation of a minor, and he planned to charge both parents with five felony counts of sexual exploitation of a minor;

- Pederson reviewed the edited black and white copies of the photos and determined that the children were nude, with their genitals exposed to the camera, and some of the images appeared posed.

Pederson later explained the significance of her belief that the children (ages five, four, and 19 months) appeared to be posed: "I would be very concerned if children were posing in provocative manners without clothing on themselves. That would concern me as to what they've observed in their . . . home."

At the time of the removal, then, Pederson knew that there were "[s]erious allegations of abuse" against the Demarees, which she investigated and corroborated by reviewing the photos, speaking with Shearer about the results of the forensic interview and medical exams, and conferring with Krause

about the potential criminal charges. *Rogers*, 487 F.3d at 1294. These circumstances "usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody,'" if the children might be at risk during the time required to obtain a removal order. *Id.*

The majority concludes, and I agree, that the only "articulated" risk to the children is that the parents would take more sexually explicit photos of them. This may not have been the only "articulable" risk, in light of the forensic interview report, but the record is clear that Pederson summarily identified the "sexually explicit pictures" as the basis for the emergency removal. She also provided the parents with a notice informing them that they were under investigation for "sexual abuse — child pornography/exploitation." Nevertheless, viewing the facts in the light most favorable to the Demarees, a jury could conclude that the children faced no immediate danger of abuse, and it was safe to leave them with their parents over the holiday weekend. Accordingly, that same jury could find that Pederson and Van Ness committed a constitutional violation by removing the children under non-exigent circumstances without a court order. I therefore concur in this portion of the per curiam Opinion. But this is not the end of the inquiry.

**Clearly Established Law**

The second prong of the qualified immunity analysis is whether the right at issue was clearly established. In determining whether a right is clearly established, "[w]e do not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). At the same time, the Supreme Court has "repeatedly told courts—and the Ninth Circuit in

particular—not to define clearly established law at a high level of generality." *Id.* at 742 (citation omitted). Neither the parties nor the majority identify any circuit precedent that addresses whether an emergency removal is justified under circumstances like these, where the type of abuse alleged is sexual exploitation, and it would take a social worker at least several days to obtain a removal order.

I disagree with the majority's view of *Malik v. Arapahoe County Department of Social Services*, 191 F.3d 1306 (10th Cir. 1999). In that case, the social worker had a court order (albeit one based on "misrepresentation and omission") to remove the child, and the defendants conceded there was no imminent danger of abuse. *Id.* at 1311–12. The court therefore devoted little consideration to the question of exigency, *see id.* at 1315 n.5:

> Our conclusion that disputed facts as viewed by the district court in the light most favorable to plaintiffs-appellees support a conclusion that defendants violated clearly established law by no means restricts the authority of law enforcement and child protective officers to seek protective custody of a child when they have legitimate concerns for the child's safety. Rather, our conclusion hinges upon the district court's finding that "[d]efendants acknowledged Julie was in no imminent danger at the time they sought the order and the facts suggest it was secured only through distortion, misrepresentation and omission."

Further, in *Malik*, the photos at issue were five months old, and the child's uncle, who took the photos, lived out of

state. Law enforcement officials had also been in contact with the child's mother and her attorney for about two weeks before seeking a temporary custody order, which supports the conclusion that they did not consider the case an emergency.

In contrast, in this case, both parents lived in the home and were subjects of an ongoing criminal investigation. They admitted to regularly taking nude photos of the children—in fact, A.J. initially thought Krause wanted to question him about additional photos that were not included in the set obtained from Walmart.[2] CPS then became involved less than twenty-four hours after the photos were first discovered, and Pederson, Van Ness, and Krause all agreed that emergency removal was appropriate under the circumstances.

Despite the absence of authority directly on point, the majority concludes that it was nevertheless "beyond debate" in 2008 that an emergency removal is only justified to protect a child from "imminent physical injury or molestation," and "[t]he risk identified here simply does not meet that standard, as it does not involve physical injury or abuse." Per curiam Op. at 25–26. I respectfully disagree for two reasons.

First, framing the issue in this way overlooks another well-established formulation of the standard, one which is quoted earlier in the Opinion: "Serious allegations of abuse that have been investigated and corroborated *usually* give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' . . . ." *Rogers*,

---

[2] The majority seems to suggest that there was no further risk of exploitation because the police seized the Demarees' photography equipment. This fact is not determinative. Even in 2008, cameras could be easily, legally, and inexpensively obtained from a variety of vendors.

487 F.3d at 1294 (emphasis added) (quoting *Ram v. Rubin*, 118 F.3d 1306, 1311 (9th Cir. 1997)). In most cases, a serious allegation of abuse may be synonymous with a risk of physical injury. Yet I do not interpret the majority to suggest that allegations of sexual exploitation or child pornography are not "serious."

Here, Pederson investigated and corroborated a serious allegation of abuse. True, it did not necessarily involve traditional physical injury. But the record reflects that the nature of the concern—sexually explicit photos—is not limited to snapping a picture. In other words, the potential danger was not that the Demarees would take more *naked* pictures of the girls; rather, the risk was that the parents were sexually exploiting their children. As Pederson explained, inherent in this allegation is the concern that there is more to the situation than meets the eye—for example, that the parents may have posed the children, or that the children may have adopted provocative poses based on behavior observed in the home. Without the benefit of clearer guidance defining the "usual" case, a reasonable social worker could be unsure how to proceed under these circumstances.

Second, the majority treats the nature of the risk and the time required to obtain a warrant as entirely distinct considerations. I do not consider them so easily separated. Ninth Circuit authority in this area rightly focuses on whether the threat to a child's safety is sufficiently "imminent" to justify immediate removal, without waiting for court approval. *See, e.g.*, *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 791 (9th Cir. 2016) (en banc) ("[T]he social workers here lacked cause to forgo a warrant if they had adequate time to pursue one through the ordinary judicial process without risking [the child's] well-being."). This is because in the

typical case, judicial review is available "within hours."  The analysis therefore naturally focuses on whether the allegations of abuse are both severe and urgent enough that it is unacceptable to allow the child to remain in the home for even a short period of time.

This case is unique: no judicial review was available for at least several days.  And this fact is both critical and, perhaps, unlikely to be repeated.  As the majority correctly notes, certain allegations of abuse or neglect might lead a reasonable social worker to feel comfortable leaving a child in the custody of his parents for just a few hours.  *See, e.g.*, *Rogers*, 487 F.3d at 1291 (bottle rot and other chronic neglect); *Mabe*, 237 F.3d at 1104–05 (sexual abuse only taking place at night).  But this Court has not had occasion to consider whether those same allegations might be cause for concern if the delay were extended to a few days.  No one wants to inflict unnecessary trauma on children, *see* Concurring Op. of Berzon, J., at 38–39, but surely this worthy consideration must be balanced by protecting their physical well-being in those cases where it is actually threatened.  All involved in the child welfare system would be well served by clear legal standards from this Court to assist social workers in making these difficult decisions.

Pederson faced a tough judgment call on that Saturday night: she could err on the side of caution and take the children into temporary custody, or she could wait three days until the courts reopened to seek a removal order.  In August 2008, it was clearly established that a child could not be removed from the home without a court order, absent evidence that the child was in imminent danger of abuse.  *See Kirkpatrick*, 843 F.3d at 792 (citing cases).  But it was not "beyond debate that the confluence of factors set forth above

would not support a finding of exigency." *Id.* at 793.  No Ninth Circuit authority addresses whether removing a child during an ongoing criminal investigation "crosse[s] the line of reasonableness" when the courts are closed for several days, and judicial review is simply not available.  *Id.*

Without fair notice, I would hold that Pederson and Van Ness are entitled to qualified immunity for removing the children without a court order.  I therefore respectfully dissent from this portion of the per curiam Opinion.